UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

ALEXIS EVERINGTON and
RICHARD WHITE,

    Plaintiffs,

v.     Case No.:     8:23-cv-2386-JLB-NHA

TIMOTHY J. RIESEN,

    Defendant.
_____/

## ORDER

Plaintiffs Alexis Everington and Richard White sue Defendant Timothy Riesen for breach of contract, constructive trust, unjust enrichment, and breach of fiduciary duty, alleging that Defendant failed to allow Plaintiffs an opportunity to exercise their stock options following the sale of Madison Springfield, Inc. (Doc. 2). Defendant filed a motion to dismiss Plaintiffs' Complaint. (Doc. 17). Plaintiffs responded (Doc. 19) and, with leave of Court (Doc. 21), Defendant replied (Doc. 24). Upon careful review, the Motion to Dismiss (Doc. 17) is **GRANTED in part** and the Court dismisses the complaint for the reasons set forth below.

## BACKGROUND[1]

After leaving their respective employers in 2011, Plaintiffs Alexis Everington and Richard White and Defendant Timothy Riesen agreed to start a business focusing on lucrative government contracts with the United States government. (Doc. 2 at ¶¶ 1, 4, 12–15). Initially, Ms. Everington and Mr. Riesen discussed establishing a company in the United Arab Emirates called "International Advisory Services" ("IAS"). (*Id.* at ¶ 14). Ms. Everington formed IAS in the UAE—but without Mr. Riesen—to compete for those sensitive government contracts. (*Id.*). Mr. Riesen advocated against joining IAS contending that IAS would not be able to successfully compete for sensitive government contracts in the United States if it were formed in the UAE. (*Id.* at ¶ 16).

Following Ms. Everington's formation of IAS in the UAE, she and Mr. Riesen discussed forming a business in the United States to compete for sensitive government contracts that may otherwise be unavailable to IAS. (*Id.* at ¶¶ 16–17). To compete for such contracts, Mr. Riesen stated that because Ms. Everington and Mr. White were not U.S. citizens, they could not be formal owners of the business because some government contracts were sensitive to national security. (*Id.* at ¶¶ 1, 17). Thus, Mr. Riesen formed "Madison Springfield, Inc." ("Madison Springfield") as

---

[1] "At the motion to dismiss stage, all well-pleaded facts are accepted as true, and the reasonable inferences therefrom are construed in the light most favorable to the plaintiff." *Bryant v. Avado Brands, Inc.*, 187 F.3d 1271, 1273 n.1 (11th Cir. 1999) (citation omitted). Accordingly, this background section relies on the facts recited in the Complaint. (*See* Doc. 2).

2

its sole owner under the laws of the state of Texas. (*Id.*; Doc. 17 at ¶¶ 1, 21; Doc. 19 at 6).

The Complaint states that Ms. Everington and Mr. White performed work for Madison Springfield, which included the responsibility of carrying out Madison Springfield's contracts with its clients. (Doc. 2 at ¶¶ 18–20). Mr. White and Ms. Everington also attended meetings as representatives of Madison Springfield, carried business cards, used the Madison Springfield email, and completed general tasks to satisfy Madison Springfield's contractual obligations. (*Id.* at ¶¶ 19, 20). And, the Complaint states that Mr. White and Ms. Everington would "carry out the contracts Madison Springfield was awarded through IAS." (*Id.* at 20). However, the record is unclear whether Ms. Everington and Mr. White were classified as employees for Madison Springfield or whether their work was performed for Madison Springfield on behalf of IAS. (Doc. 24 at 3, Doc. 2 at ¶¶ 2, 4). Importantly, Plaintiffs claim that they had an oral agreement with Defendant to be partners in Madison Springfield as discussed further below. (Doc. 2 at ¶¶ 53–58).

To compensate Ms. Everington and Mr. White for their lack of "official" ownership in Madison Springfield, Mr. Riesen gave them stock options in 2013. (*Id.* at ¶ 21). The stock options provided that Ms. Everington and Mr. White each would receive 10% of Madison Springfield stock if the company were sold or experienced a change in control. (*Id.* at ¶¶ 21–22). The stock option agreement also obligated Madison Springfield (and effectively Mr. Riesen as its sole owner) to formally notify Ms. Everington and Mr. White of a change in control event so that they could

3

exercise their stock options. (*Id.* at ¶ 22). Years later, Ms. Everington and Mr. White expressed disappointment in their stock allocations. (*Id.* at ¶ 25). This prompted Mr. Riesen to agree to increase their respective options from 10% to 25% in 2016. (*Id.*).

In November 2020, Mr. Riesen informed Mr. White and Ms. Everington that he intended to sell Madison Springfield for between $40 and $50 million. (*Id.* at ¶¶ 27–28). Mr. Riesen then engaged an investment banker to market a sale. (*Id.* at ¶ 32).

In May 2021, Riesen stated that Madison Springfield may only sell between $10 million to $25 million because the company had performed poorly over the past 12 months. (*Id.* at ¶¶ 36, 37). He then stated that a prospective purchaser was willing to purchase Madison Springfield, and that Mr. White and Ms. Everington would be owed $3 million each under the deal. (*Id.* at ¶¶ 38–39).

Mr. Riesen then approached IAS in May 2022 to sign a Bonus Agreement, allowing for Mr. White and Ms. Everington to each receive $1 million when the transaction closed. (*Id.* at ¶ 41). Ms. Everington signed the Bonus Agreement on behalf of IAS. (*Id.* at ¶ 43). Following the sale of Madison Springfield, Mr. Riesen sent the $2 million to IAS in June 2022 and did not provide the merger agreement or any supporting documentation. (*Id.* at ¶¶ 47–49). The Bonus Agreement contained the following release:

> Release. Conditioned upon, and effective as of, Recipient's receipt of the Bonus Payment Amount, Recipient, for and on behalf of itself and its predecessors, successors, affiliates, and assigns (collectively, the "Releasors") hereby knowingly, fully, unconditionally, completely and

4

> irrevocably forever releases and discharges Ultimate Parent, Buyer, the Company, and each of their respective current and former affiliates (together, the "Released Companies"), and each of the Released Companies' respective past or present officers, directors, stockholders, partners, members, subsidiaries, affiliates, agents, advisors, representatives and employees, and each of their respective predecessors, successors, heirs, executors, administrators, beneficiaries, legatees and assigns (collectively, the "Releasees"), from, and agrees not to sue any of the Releasees with respect to, any and all claims, actions, causes of action, suits, debts, dues, sums of money, accounts, reckonings, covenants, contracts, controversies, agreements, promises, variances, trespasses, damages, judgments, expenses, executions, affirmative defenses, demands and other obligations or liabilities whatsoever, in law or equity, whether known or unknown, past or present, asserted or unasserted, suspected or unsuspected, fixed or contingent, which Recipient or any of the Releasors ever had, now have or may ever have against any of the Releasees, in each case to the extent based on, arising out of, or resulting from or relating, directly or indirectly, to the negotiation, execution and delivery of this Agreement or any amounts payable by the Company or its affiliates.[2]

(Doc. 17-1 at 2). The Bonus Agreement also provided that the agreement "supersedes any and all prior agreements, arrangements and understandings, written or oral, between Recipient and [Madison Springfield] . . . ." (*Id.* at 3).

## LEGAL STANDARD

Federal Rule of Civil Procedure 12(b)(6) allows a complaint to be dismissed for failure to state a claim upon which relief can be granted. To survive a motion to dismiss under Rule 12(b)(6), a complaint must contain sufficient factual matter to "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662,

---

[2] The Court notes that the Bonus Agreement itself was not attached to the complaint. However, the Court may consider a document attached to a motion to dismiss in ruling on such motion without converting it into one for summary judgment. *See Horsley v. Feldt*, 304 F.3d 1125, 1134 (11th Cir. 2002) (holding that the court may consider a document attached to a motion to dismiss where the attached document is (1) central to plaintiff's claim and (2) undisputed).

5

678 (2009) (internal quotation marks and citation omitted). This standard of plausibility is met when the plaintiff pleads enough factual content "to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citation omitted).

"At the motion to dismiss stage, all well-pleaded facts are accepted as true, and the reasonable inferences therefrom are construed in the light most favorable to the plaintiff." *Bryant*, 187 F.3d at 1273 n.1 (citing *Hawthorne v. Mac Adjustment, Inc.*, 140 F.3d 1367, 1370 (11th Cir. 1998)). To warrant dismissal of a complaint under Federal Rule of Civil Procedure 12(b)(6), it must be "clear that no relief could be granted under any set of facts that could be proved consistent with the allegations." *Blackston v. State of Alabama*, 30 F.3d 117, 120 (11th Cir. 1994) (quoting *Hishon v. King & Spalding*, 467 U.S. 69, 73 (1984)).

## DISCUSSION

Defendant argues that Plaintiffs have failed to state a claim for which relief can be granted under Federal Rule of Civil Procedure 12(b)(6). (Doc. 17). Specifically, Defendant asserts that Plaintiffs: (1) released the claims brought in this lawsuit because IAS signed the Bonus Agreement containing a release of all claims; (2) cannot plead a cause of action for breach of fiduciary duty because Florida and Texas law do not recognize a pre-formation fiduciary duty among prospective business partners; (3) cannot plead a cause of action for "constructive trust" because it is an equitable remedy rather than a standalone cause of action; and (4) filed a complaint that constitutes a shotgun pleading. (Doc. 17 at 3–4).

6

Upon review of Plaintiffs' complaint, the parties' briefing, and the entire record, the Court dismisses the complaint for the reasons set forth below.

## I. The Bonus Agreement

First, Defendant argues that the Bonus Agreement contained a release provision that bars Plaintiffs from suing under any claims brought in this case. (Doc. 17 at 4–11). The governing law provision of the Bonus Agreement states that the agreement shall be governed by and construed in accordance with the laws of the State of Delaware. (Doc. 17-1 at 3). Here, the parties agree that Delaware law applies.

When interpreting a contract under Delaware Law, the Court will "give priority to the parties' intentions as reflected in the four corners of the agreement." *GMG Cap. Invs., LLC v. Athenian Venture Partners I, L.P.*, 36 A.3d 776, 779 (Del. 2012) (citing *Paul v. Deloitte & Touche, LLP*, 974 A.2d 140, 145 (Del. 2009)). In upholding the intentions of the parties, "a court must construe the agreement as a whole, giving effect to all provisions therein." *Id.* (citation omitted). Where a contract is clear and unambiguous, the Court will apply its ordinary meaning. *Id.* at 780 (citing *Paul*, 974 A.2d at 145). "A contract is not rendered ambiguous simply because the parties do not agree upon its proper construction." *Id.* (citation omitted). Instead, an ambiguity exists "[w]hen the provisions in controversy are fairly susceptible of different interpretations or may have two or more different meanings." *Id.* (citation omitted). And, where the contract's plain meaning (in the context of the overall structure of the contract) is susceptible to more than one

7

reasonable interpretation, courts may consider extrinsic evidence[3] and look beyond the language of the text to ascertain the parties' intentions in resolving the ambiguity.  *Salamone v. Gorman*, 106 A.3d 354, 374 (Del. 2014) (citation omitted); *GMG Cap. Invs., LLC*, 36 A.3d at 780.

Moreover, Delaware law provides that "general releases are common and their validity is unchallenged." *Riverbend Cmty., LLC v. Green Stone Eng'g, LLC*, 55 A.3d 330, 336 (Del. 2012) (citation omitted).  General releases are releases that intend to "cover everything," namely "what the parties presently have in mind, as well as what they do not have in mind." *Seven Invs., LLC v. AD Cap., LLC*, 32 A.3d 391, 397 (Del. Ch. 2011).  "In construing a release, the intent of the parties as to its scope and effect are controlling, and the court will attempt to ascertain their intent from the overall language of the document." *Riverbend Cmty.*, 55 A.3d at 336 (internal quotations and citation omitted).

When a motion to dismiss "relies upon . . . waiver and release, the Court may dismiss a claim if the plaintiff includes in its pleadings facts that incontrovertibly constitute an affirmative defense to a claim." *Seven Invs., LLC*, 32 A.3d at 397 (citation omitted).

---

[3] "Such extrinsic evidence may include overt statements and acts of the parties, the business context, prior dealings between the parties, [and] business custom and usage in the industry. After examining the relevant extrinsic evidence, a court may conclude that, given the extrinsic evidence, only one meaning is objectively reasonable in the circumstances of [the] negotiation." *Salamone v. Gorman*, 106 A.3d 354, 374–75 (Del. 2014) (citation omitted) (alterations in original).

Here, the Bonus Agreement, which is incorporated into the Complaint, shows that Ms. Everington, as Director of Operations for IAS, signed the Bonus Agreement.  (Doc. 17-1).  The Bonus Agreement contained both a general release provision and a provision stating that the agreement superseded "any and all prior agreements. . . with respect to the subject matter hereof." (*Id.* at ¶¶ 5, 6). Specifically, Paragraph 5 (the release provision) stated that upon "receipt of the Bonus Payment Amount, Recipient, for on behalf of itself and its predecessors, successors, *affiliates*, and assigns. . . hereby knowingly, fully, unconditionally, completely, and irrevocably forever releases [the Releasees, including Madison Springfield,] with respect to, any and all claims, actions, causes of action . . . based on, arising out of, or resulting from or relating, directly or indirectly . . . [to] this Agreement or *any amounts payable by* [Madison Springfield] *or its affiliates.*" (*Id.* at ¶ 5) (emphasis added).  Moreover, Paragraph 6 provided that the Bonus Agreement "*supersedes* any and all prior agreements, arrangements and understandings, written or oral, between Recipient and [Madison Springfield] with respect to the subject matter hereof." (*Id.* at ¶ 6) (emphasis added).  This language suggests that Plaintiffs have released their present causes of action because Ms. Everington executed the Bonus Agreement in May 2022, which is well after the execution of the stock option agreements in 2016. (Doc. 2 at ¶¶ 25, 43)

But it is unclear whether Plaintiffs have indeed released their claims. Notably, Defendant argues that even though Ms. Everington signed the Bonus Agreement in her capacity as Director of Operations for IAS, both Ms. Everington

9

and Mr. White were "affiliates" under the agreement and thus their current claims are barred under that agreement. (Doc. 17 at ¶¶ 13–18). Defendant points out that the stock option agreements only provided for the stock options if the Plaintiffs were "employees" of Madison Springfield. (Doc. 24 at ¶ 3; Doc. 19-2). And, according to Defendant, because Plaintiffs were not technically employees of Madison Springfield, there was no breach of contract because Plaintiffs were not employed for the stock options to be valid in the first instance (*Id.*). Put differently, Defendant argues that the Complaint failed to allege that Plaintiffs were employed by Madison Springfield. (*Id.*). The Court agrees that the Complaint is, at the very least, unclear on that point.

At the outset, the Bonus Agreement does not define "affiliate." (*See* Doc. 17-1). When terms are not defined in a contract, Delaware courts look to dictionaries for assistance in determining the plain meaning of terms. *Lorillard Tobacco Co. v. Am. Legacy Found.*, 903 A.2d 728, 738 (Del. 2006). In determining the meaning of "affiliate," Delaware courts, citing Black's Law Dictionary and Merriam-Webster's Collegiate Dictionary, have found that affiliate means, among other things, (1) "an affiliated person or organization," or (2) "being close in connection, allied, associated, or attached as a member or branch . . . ." *Geier v. Mozido, LLC*, No. CV 10931-VCS, 2016 WL 5462437, at *6 (Del. Ch. Sept. 29, 2016) (citing Merriam-Webster's Collegiate Dictionary 21 (11th ed. 2003)); *see also* Black's Law Dictionary, 1446 (7th ed. 1999)).

Upon review of Plaintiffs' complaint, the Court is not satisfied that Plaintiffs have properly pleaded that they are entitled to the relief sought in their Complaint. This is because Plaintiffs' complaint is unclear as to whether Plaintiffs were employed by Madison Springfield or if Plaintiffs were employed by IAS. Plaintiffs state that they had an oral partnership agreement with Madison Springfield and "would attend meetings as representatives of Madison Springfield, carry business cards, use [Madison Springfield's] emails, discuss all work opportunities with [Defendant] and would generally do whatever was necessary for Madison Springfield to meet its contractual obligations with its customers." (Doc. 2 at ¶ 19). Plaintiffs then claim that they would "carry out the contracts Madison Springfield was awarded through IAS." (*Id.* at ¶ 20). Defendant counters by stating that Plaintiffs were never employed through Madison Springfield and that their work was completed through IAS. (Doc. 24 at ¶¶ 3, 5–6). Defendant contends that, because Plaintiffs' work was completed through IAS, they bear a "close relationship" to IAS and, because IAS signed the Bonus Agreement with Madison Springfield, that Plaintiffs' claims are barred due to the release provision in the agreement. (*Id.* at ¶¶ 5, 6; Doc. 17-1 at ¶¶ 5, 6). After reviewing the parties' arguments, the Bonus Agreement, and the allegations in the Complaint, the Court finds that the better course is to permit Plaintiffs to file an amended pleading consistent with this Order, addressing whether, as Defendants suggest, the Bonus Agreement "effectuated a full and complete release of all claims and causes of actions possessed by IAS and its affiliates, i.e. Everington and White, against [Madison Springfield] and . . . [Mr.]

11

Riesen . . . ." (Doc. 17 at ¶ 20). Indeed, given the noted deficiencies in Plaintiffs' Complaint, clarification is needed as to the relationship between Plaintiffs, their work, Madison Springfield, and IAS.

## II. Breach of Fiduciary Duty

Next, Defendant argues that Plaintiffs have failed to state a claim upon which relief can be granted because Florida and Texas law do not recognize a pre-formation fiduciary duty among prospective business partners. (Doc. 17 at 11–13). The Court finds this argument unpersuasive.

Florida's law of partnerships provides that "the law of the jurisdiction in which a partnership has its chief executive office governs relations among partners and between partners and a partnership." *LeBlanc v. Unifund CCR Partners*, 601 F.3d 1185, 1202 (11th Cir. 2010) (citing Fla. Stat. § 620.8106(1)) (internal quotations omitted). Here, both parties agree that Madison Springfield was organized as a corporation under the state of Texas. (Doc. 19 at 9; Doc. 17 at ¶ 21). Thus, Texas law governs Plaintiffs' claim for breach of fiduciary duty.

To plead a claim for breach of fiduciary duty under Texas law, a plaintiff must show "(1) the existence of a fiduciary duty, (2) breach of the duty, (3) causation, and (4) damages." *First United Pentecostal Church of Beaumont v. Parker*, 514 S.W.3d 214, 220 (Tex. 2017) (citation omitted). As a matter of common law, Texas courts recognize that the "[t]he relationship between . . . partners . . . is fiduciary in character, and imposes upon all the participants the obligation of loyalty to the joint concern and of the utmost good faith, fairness, and honesty in

12

their dealings with each other with respect to matters pertaining to the enterprise." *Bohatch v. Butler & Binion*, 977 S.W.2d 543, 545 (Tex. 1998) (quoting *Gerald v. Hull,* 150 Tex. 39, 237 S.W.2d 256, 264 (1951)) (internal quotation marks omitted).

Under Texas law, a partnership is "an association of two or more persons to carry on a business for profit as owners . . . regardless of whether . . . (1) the persons intend to create a partnership; or (2) the association is called a 'partnership,' 'joint venture,' or other name." Tex. Bus, Ord. Code § 152.051(b). In determining whether a partnership was formed, absent a written agreement, Texas law considers the totality of the circumstances regarding five factors:

> (1) receipt or right to receive a share of profits of the business;
> (2) expression of an intent to be partners in the business;
> (3) participation or right to participate in control of the business;
> (4) agreement to share or sharing:
>     (A) in losses of the business; or
>     (B) for liabilities against the business; and
> (5) agreement to contribute or contributing money or property to the business.

*Nguyen v. Hoang*, 507 S.W.3d 360, 371 (Tex. App. 2016) (quoting Tex. Bus. Orgs. Code § 152.052(a)). Section 152.052 does not require all five factors to be present, and Texas courts consider profit sharing the most important element of a partnership. *Ingram v. Deere*, 288 S.W.3d 886, 896 (Tex. 2009); *see also Nguyen*, 507 S.W.3d at 372 ("[T]he traditional import of sharing profits as well as control over the business will probably continue to be the most important factors . . . ."). To determine whether there was an intent to form a partnership, "courts should review the putative partners' speech, writings, and conduct." *Id.* at 899.

Here, the Court finds that Plaintiffs have sufficiently pleaded a claim for breach of fiduciary duty. First, Plaintiffs allege that they had a right to share in the profits of Madison Springfield and that Defendant expressed an intent to be partners in the business. (Doc. 2 at ¶ 54). Specifically, Plaintiffs state that Mr. Riesen, Mr. White, and Ms. Everington "agreed that they would share the value derived from any sale of the business venture that ultimately became Madison Springfield" and Plaintiffs state that they were each entitled to realize 25 percent of the business profits. (Doc. 2 at ¶¶ 54–55). Plaintiffs point to emails and text messages exchanged between Mr. White and Ms. Everington, as well as the stock option agreements, as proof that a partnership was formed. (*Id.* at ¶¶ 54–56). Second, Plaintiffs adequately allege that Mr. Riesen breached their oral partnership agreement and the stock option agreements, which caused the Plaintiffs compensatory damages in an amount exceeding $75,000. (*Id.* at ¶¶ 57-58). These factual allegations state a cause of action for breach of fiduciary duty. *See Nguyen*, 507 S.W.3d 360 (holding that the right to receive a share of profits and expression of intent to be partners, among other things, establishes whether a partnership was formed). The Court therefore concludes that Plaintiffs have stated a claim for breach of fiduciary duty.

## III. Constructive Trust

Defendants next seek dismissal of Plaintiffs' constructive trust claim, arguing that constructive trust is an equitable remedy rather than a standalone cause of action. (Doc. 17 at 13). Notably, Plaintiffs agree that a constructive trust is not a

14

stand-alone cause of action, but rather an equitable remedy. (Doc. 19 at 13). Accordingly, the Court finds that Plaintiffs' constructive trust claim is due to be dismissed. *See Absolute Activist Value Master Fund Ltd. v. Devine*, 233 F. Supp. 3d 1297, 1328 (M.D. Fla. 2017) ("[A] constructive trust is not a cause of action, but an equitable remedy based upon an established cause of action"); *see also Sherer v. Sherer*, 393 S.W.3d 480, 491 (Tex. App. 2013) ("A constructive trust is a remedy–not a cause of action."). Though Plaintiffs' constructive trust claim is dismissed, Plaintiffs are free to seek a constructive trust as a remedy in this case.

## IV. Shotgun Pleading

Lastly, Defendant claims that Plaintiffs' complaint constitutes a "shotgun pleading" because it contains multiple counts that adopt the allegations of all preceding counts. (Doc. 17 at 14-15).

The Federal Rules of Civil Procedure provide that a complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief," and that a "party must state its claims or defenses in numbered paragraphs, each limited as far as practicable to a single set of circumstances." Fed. R. Civ. P. 8(a)(2); Fed. R. Civ. P. 10(b). Complaints that fail to meet these standards are sometimes called "shotgun pleadings." *Weiland v. Palm Beach Cnty. Sheriff's Off.*, 792 F.3d 1313, 1320 (11th Cir. 2015). The Eleventh Circuit has "repeatedly condemned shotgun pleadings," explaining that they "fail[] to give the defendants adequate notice of the claims against them and the grounds upon which each claim

15

rests." *Embree v. Wyndham Worldwide Corp.*, 779 F. App'x 658, 662 (11th Cir. 2019) (citing *Weiland*, 792 F.3d at 1323).

The Eleventh Circuit has enumerated four types of shotgun complaints. *Weiland*, 792 F.3d at 1321. The most common type is the one at issue here – "a complaint containing multiple counts where each count adopts the allegations of all preceding counts, causing each successive count to carry all that came before and the last count to be a combination of the entire complaint." *Id.* This type of shotgun pleading is problematic because "[b]y the time a reader of the pleading gets to the final count, it is exceedingly difficult, if not impossible, to know which allegations pertain to that count (according to its label), to separate the wheat from the chaff." *Keith v. DeKalb Cnty.*, 749 F.3d 1034, 1045 n.39 (11th Cir. 2014). Such shotgun pleadings "require the district court to sift through allegations in an attempt to separate the meritorious claims from the unmeritorious, resulting in a 'massive waste of judicial and private resources.'" *Alonso v. Regions Bank*, No. 8:22-cv-1057-CEH-JSS, 2022 WL 1555434, at *2 (M.D. Fla. May 17, 2022) (quoting *PVC Windows, Inc. v. Babbitbay Beach Constr., N.V.*, 598 F.3d 802, 806 n.4 (11th Cir. 2010)).

Defendant's criticisms have some merit. Given that the Court is dismissing the Complaint due to Plaintiffs' lack of detail regarding their relationship with Madison Springfield, as noted above, the Court encourages Plaintiffs to amend such that it is clear *which facts pertain to which count.*

Accordingly, the Court finds that the entire Complaint is due to be dismissed without prejudice. The Court gives Plaintiffs leave to file an Amended Complaint. *See* Fed. R. Civ. P. 15(a)(2) ("The court should freely give leave [to amend] when justice so requires.").

## CONCLUSION

For the foregoing reasons, it is **ORDERED** that:

1) Defendant Mr. Riesen's Motion to Dismiss (Doc. 17) is **GRANTED in part** to the extent that the Complaint (Doc. 2) is dismissed without prejudice. Plaintiffs may file an amended complaint.

2) Count Two is **DISMISSED with prejudice**.

3) Plaintiff is **DIRECTED** to file an amended complaint no later than September 16, 2024.

**ORDERED** in Tampa, Florida on August 15, 2024.

JOHN L. BADALAMENTI
UNITED STATES DISTRICT JUDGE