UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

ALEXIS EVERINGTON and
RICHARD WHITE,

        Plaintiffs,

v.                           Case No.:    8:23-cv-2386-JLB-NHA

TIMOTHY J. RIESEN,

        Defendant.
_____/

## <u>ORDER</u>

Plaintiffs Alexis Everington and Richard White sue Defendant Timothy Riesen for breach of contract, breach of fiduciary duty, fraudulent misrepresentation, and unjust enrichment, alleging that Mr. Riesen failed to allow Plaintiffs an opportunity to exercise their stock options following the sale of Madison Springfield, Inc. (Doc. 31). Mr. Riesen filed a motion to dismiss Plaintiffs' amended Complaint. (Doc. 39). Plaintiffs responded (Doc. 42) and, with leave of Court (Doc. 45), Mr. Riesen replied (Doc. 49). Upon careful review, Mr. Riesen's Motion to Dismiss (Doc. 39) is **GRANTED in part.** The Court dismisses the amended Complaint for the reasons stated herein.

## BACKGROUND[1]

After leaving their respective employers in 2011, Plaintiffs Alexis Everington and Richard White agreed to start a business with Defendant Timothy Riesen to support public and private organizations seeking insights on foreign markets, competitors, and industry trends.  (Doc. 31 at ¶ 1).  Initially, Mr. Everington and Mr. Riesen discussed establishing a company in the United Arab Emirates called "International Advisory Services" ("IAS").  (*Id.* at ¶ 16).  The new business would be formed to compete for U.S. government defense sector contracts.  (*Id.* at ¶ 17).

Mr. Riesen advocated against joining IAS because the new business would need to be formed in the United States and owned by United States citizens to compete for such contracts.  (*Id.* at ¶ 18).  Because Mr. Everington and Mr. White were not U.S. citizens, they agreed to give Mr. Riesen, a U.S. citizen, 100 percent formal ownership of the new business.  (*Id.* at ¶¶ 11–13, 19).  Additionally, Operational Security ("OPSEC") requirements relating to sensitive government contracts made it wise for Everington and White not to be openly identified in the new business.  (*Id.* at ¶ 1).  As such, Mr. Riesen established himself as the sole owner of the new business, Madison Springfield, Inc. ("Madison Springfield"), and Mr. Everington and Mr. White agreed to be compensated in "some other way."  (*Id.* at ¶¶ 1, 19).

---

[1] "At the motion to dismiss stage, all well-pleaded facts are accepted as true, and the reasonable inferences therefrom are construed in the light most favorable to the plaintiff." *Bryant v. Avado Brands, Inc.*, 187 F.3d 1271, 1273 n.1 (11th Cir. 1999) (citation omitted). Accordingly, this background section relies on the facts recited in the amended Complaint. (*See* Doc. 31).

Mr. Everington and Mr. White had an oral agreement with Mr. Riesen to work as partners to form and develop Madison Springfield into a successful business. (*Id.* at ¶¶ 2, 20). That oral agreement came with the vision that Madison Springfield would eventually be sold at a profit, with all three (3) partners sharing in the proceeds. (*Id.*). Mr. Everington and Mr. White attended meetings as representatives of Madison Springfield, provided job training to Madison Springfield employees, carried Madison Springfield business cards, used Madison Springfield emails, and advised Mr. Riesen on contracts. (*Id.* at ¶ 21). Mr. Riesen also listed Mr. Everington as Madison Springfield's Director of Research and Mr. White as Director of Analysis. (*Id.* at ¶ 37).

Mr. White and Mr. Everington would carry out the contracts Madison Springfield was awarded through IAS. (*Id.* at ¶ 27). IAS was the vehicle through which Mr. Everington and Mr. White were paid for work. (*Id.* at ¶¶ 24–26). Mr. Everington was the director of IAS, and Mr. White provided independent contract work. (*Id.*). Mr. White did not have control over IAS. (*Id.*).

To formalize their oral agreement to work as partners, Mr. Riesen gave Mr. Everington and Mr. White stock options in 2013. (*Id.* at ¶ 28). Those stock option agreements gave Mr. Everington and Mr. White each an option to purchase 10 percent of Madison Springfield stock if there was a "change in control." (*Id.*). The agreements also obligated Madison Springfield (and effectively Mr. Riesen as its sole owner) to formally notify Mr. Everington and Mr. White of a change in control event so that they could exercise their stock options. (*Id.* at ¶ 29). Mr. Everington

and Mr. White later expressed disappointment in their stock allocations. (*Id.* at ¶ 30). In 2016, Mr. Riesen agreed to increase their respective options from 10 percent to 25 percent. (*Id.* at ¶ 32).

In November 2020, Mr. Riesen informed Mr. White and Mr. Everington that he intended to sell Madison Springfield for between $40 and $50 million. (*Id.* at ¶¶ 40–41). Mr. Riesen then engaged an investment banker to market a sale. (*Id.* at ¶ 43).

In May 2021, Riesen stated that Madison Springfield may only sell between $10 million and $25 million because the company had performed poorly over the past twelve (12) months. (*Id.* at ¶¶ 49–50). He then stated that a prospective buyer was willing to purchase Madison Springfield, and that Mr. White and Mr. Everington would be owed $3 million each under the deal. (*Id.* at ¶¶ 51–52). During the negotiations, Mr. Riesen kept Mr. Everington and Mr. White "generally up to date" as the deal worked through various stages of activity. (*Id.* at ¶ 53). However, Mr. Riesen never provided them with any negotiated terms of the sale. (*Id.*).

Mr. Riesen then approached Mr. Everington in May 2022 to have IAS sign a Bonus Agreement, allowing for Mr. White and Mr. Everington to each receive a $1 million bonus when the transaction closed. (*Id.* at ¶ 54). Mr. Everington signed the Bonus Agreement as director on behalf of IAS. (*Id.* at ¶ 55). The Bonus Agreement contained the following release:

> <u>Release</u>. Conditioned upon, and effective as of, Recipient's receipt of the Bonus Payment Amount, Recipient, for and on behalf of itself and its

predecessors, successors, affiliates, and assigns (collectively, the "Releasors") hereby knowingly, fully, unconditionally, completely and irrevocably forever releases and discharges Ultimate Parent, Buyer, the Company, and each of their respective current and former affiliates (together, the "Released Companies"), and each of the Released Companies' respective past or present officers, directors, stockholders, partners, members, subsidiaries, affiliates, agents, advisors, representatives and employees, and each of their respective predecessors, successors, heirs, executors, administrators, beneficiaries, legatees and assigns (collectively, the "Releasees"), from, and agrees not to sue any of the Releasees with respect to, any and all claims, actions, causes of action, suits, debts, dues, sums of money, accounts, reckonings, covenants, contracts, controversies, agreements, promises, variances, trespasses, damages, judgments, expenses, executions, affirmative defenses, demands and other obligations or liabilities whatsoever, in law or equity, whether known or unknown, past or present, asserted or unasserted, suspected or unsuspected, fixed or contingent, which Recipient or any of the Releasors ever had, now have or may ever have against any of the Releasees, in each case to the extent based on, arising out of, or resulting from or relating, directly or indirectly, to the negotiation, execution and delivery of this Agreement or any amounts payable by the Company or its affiliates.[2]

(Doc. 42-1 at 1). The Bonus Agreement also provided that the agreement "supersedes any and all prior agreements, arrangements and understandings, written or oral, between Recipient and [Madison Springfield] . . . ." (*Id.* at 2).

Mr. Riesen also represented that he would pay Mr. White and Mr. Everington an additional $4 million through IAS when it was feasible to do so. (Doc. 31 at ¶ 56). Up until this point, Mr. Riesen had not shared the sale or merger agreements

---

[2] The Court notes that the Bonus Agreement itself was not attached to the complaint. However, the Court may consider a document attached to a motion to dismiss or its response in ruling on such motion without converting it into one for summary judgment. *See Horsley v. Feldt*, 304 F.3d 1125, 1134 (11th Cir. 2002) (holding that the court may consider a document attached to a motion to dismiss where the attached document is (1) central to plaintiff's claim and (2) undisputed); *see also Urbanek v. Stryjewski*, No. 8:22-cv-2501, 2023 WL 3751980, at *2 n.2 (M.D. Fla. Mar. 20, 2023) (holding that a court may consider documents attached to a response).

with Everington and White.  (*Id.* at ¶ 57).  On June 3, 2022, Mr. Riesen informed Mr. Everington and Mr. White that he would wire IAS the $2 million and not the acquiring entity.  (*Id.* at ¶ 59).  Mr. Everington found that odd because he thought that he and Mr. White were entitled to 50 percent equity in Madison Springfield. (*Id.* at ¶ 60).  Mr. Everington pushed to see the actual merger documents, which Mr. Riesen continued to keep secret.  (*Id.*).

Following the sale of Madison Springfield, Mr. Riesen sent the $2 million he owed under the Bonus Agreement to IAS in June 2022 and did not provide the merger agreement or any supporting documentation.  (*Id.* at ¶ 61).

In September 2022, Mr. Riesen's lawyer sent Mr. Everington and Mr. White a generic transaction summary after Mr. Everington signed a non-disclosure agreement.  (Doc. 31 at ¶¶ 65, 67).  The letter indicated that Mr. Riesen agreed to pay Mr. Everington and Mr. White an additional $4 million.  (*Id.* at ¶ 67).  To date, Mr. Riesen has failed to pay Mr. Everington and Mr. White the additional $4 million, and they claim he has hidden the actual terms of the merger of Madison Springfield.  (*Id.* at ¶ 69).

Invoking the Court's diversity jurisdiction[3], Mr. Everington and Mr. White now sue Mr. Riesen for breach of contract, breach of fiduciary duty, fraudulent misrepresentation, and unjust enrichment, alleging that Mr. Riesen failed to allow Plaintiffs an opportunity to exercise their stock options following the Madison

---

[3] This Court has jurisdiction pursuant to 28 U.S.C. § 1332 because Plaintiffs are citizens of the United Kingdom and Defendant is a citizen of the state of Florida.  (Doc. 31 at ¶¶ 9, 11–13).  The amount in controversy exceeds $75,000.  (*Id.* at ¶ 9).

Springfield sale. (Doc. 31). Plaintiffs filed their initial complaint on October 20, 2023. (Doc. 2). Mr. Riesen moved to dismiss that Complaint (Doc. 17), and the Court granted that motion in part (Doc. 29). Mr. Everington and Mr. White then filed an amended Complaint on September 13, 2024. (Doc. 31). Mr. Riesen filed a motion to dismiss that Complaint. (Doc. 39). Plaintiffs responded (Doc. 42) and, with leave of Court (Doc. 45), Defendant replied (Doc. 49).

## LEGAL STANDARD

Federal Rule of Civil Procedure 12(b)(6) allows a complaint to be dismissed for failure to state a claim upon which relief can be granted. To survive a motion to dismiss under Rule 12(b)(6), a complaint must contain sufficient factual matter to "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation marks and citation omitted). This standard of plausibility is met when the plaintiff pleads enough factual content "to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citation omitted).

"At the motion to dismiss stage, all well-pleaded facts are accepted as true, and the reasonable inferences therefrom are construed in the light most favorable to the plaintiff." *Bryant*, 187 F.3d at 1273 n.1 (citing *Hawthorne v. Mac Adjustment, Inc.*, 140 F.3d 1367, 1370 (11th Cir. 1998)). To warrant dismissal of a complaint under Federal Rule of Civil Procedure 12(b)(6), it must be "clear that no relief could be granted under any set of facts that could be proved consistent with the

allegations." *Blackston v. State of Alabama*, 30 F.3d 117, 120 (11th Cir. 1994)

(quoting *Hishon v. King & Spalding*, 467 U.S. 69, 73 (1984)).

## DISCUSSION

Mr. Riesen argues that Mr. Everington and Mr. White have failed to state a

claim under Federal Rule of Civil Procedure 12(b)(6).  (Doc. 39).  Specifically, Mr.

Riesen asserts that: (1) Plaintiffs released the claims brought in this lawsuit

because IAS signed the Bonus Agreement, (2) Plaintiffs have failed to allege that

they were Madison Springfield employees, (3) the economic loss rule bars Plaintiffs'

claim for breach of fiduciary duty; (4) Plaintiffs have failed to state a claim for

fraudulent misrepresentation or inducement; and (5) Plaintiffs improperly

comingled breach of contract claims.  (Doc. 39).  Upon review of Plaintiffs' amended

Complaint, the parties' briefing and exhibits thereto, the Court finds that Mr.

Riesen's Motion to Dismiss (Doc. 39) is due to be **GRANTED in part**.

## I.  Plaintiffs have demonstrated that the Bonus Agreement does not bar their claims.

First, Defendant argues that the Bonus Agreement contained a release

provision that bars Plaintiffs from suing under any claims brought in this case.

(Doc. 39 at 3–5).  The governing law provision of the Bonus Agreement states that

the agreement shall be governed by and construed in accordance with the laws of

the State of Delaware.  (Doc. 42-1 at 2).  Here, the parties agree that Delaware law

applies.

When interpreting a contract under Delaware Law, the Court will "give

priority to the parties' intentions as reflected in the four corners of the agreement."

*GMG Cap. Invs., LLC v. Athenian Venture Partners I, L.P.*, 36 A.3d 776, 779 (Del. 2012) (citing *Paul v. Deloitte & Touche, LLP*, 974 A.2d 140, 145 (Del. 2009)). In upholding the intentions of the parties, "a court must construe the agreement as a whole, giving effect to all provisions therein." *Id.* (citation omitted). Where a contract is clear and unambiguous, the Court will apply its ordinary meaning. *Id.* at 780 (citing *Paul*, 974 A.2d at 145). "A contract is not rendered ambiguous simply because the parties do not agree upon its proper construction." *Id.* (citation omitted). Instead, an ambiguity exists "[w]hen the provisions in controversy are fairly susceptible of different interpretations or may have two or more different meanings." *Id.* (citation omitted). And, where the contract's plain meaning (in the context of the overall structure of the contract) is susceptible to more than one reasonable interpretation, courts may consider extrinsic evidence[4] and look beyond the language of the text to ascertain the parties' intentions in resolving the ambiguity. *Salamone v. Gorman*, 106 A.3d 354, 374 (Del. 2014) (citation omitted); *GMG Cap. Invs., LLC*, 36 A.3d at 780.

Moreover, Delaware law provides that "general releases are common and their validity is unchallenged." *Riverbend Cmty., LLC v. Green Stone Eng'g, LLC*, 55 A.3d 330, 336 (Del. 2012) (citation omitted). General releases are releases that intend to "cover everything," namely "what the parties presently have in mind, as

---

[4] "Such extrinsic evidence may include overt statements and acts of the parties, the business context, prior dealings between the parties, [and] business custom and usage in the industry. After examining the relevant extrinsic evidence, a court may conclude that, given the extrinsic evidence, only one meaning is objectively reasonable in the circumstances of [the] negotiation." *Salamone v. Gorman*, 106 A.3d 354, 374–75 (Del. 2014) (citation omitted) (alterations in original).

well as what they do not have in mind." *Seven Invs., LLC v. AD Cap., LLC*, 32 A.3d 391, 397 (Del. Ch. 2011) (citation omitted). "In construing a release, the intent of the parties as to its scope and effect are controlling, and the court will attempt to ascertain their intent from the overall language of the document." *Riverbend Cmty.*, 55 A.3d at 336 (internal quotations and citation omitted).

When a motion to dismiss "relies upon . . . waiver and release, the Court may dismiss a claim if the plaintiff includes in its pleadings facts that incontrovertibly constitute an affirmative defense to a claim." *Seven Invs., LLC*, 32 A.3d at 397 (citation omitted).

Here, the Bonus Agreement shows that Ms. Everington, as Director of Operations for IAS, signed the Bonus Agreement. (Doc. 42-1 at 3). The Bonus Agreement contained both a general release provision and a provision stating that the agreement superseded "any and all prior agreements. . . with respect to the subject matter hereof." (*Id.* at ¶¶ 5, 6). Specifically, Paragraph 5 (the release provision) stated that

> [U]pon . . . receipt of the Bonus Payment Amount, Recipient, for on behalf of itself and its predecessors, successors, *affiliates*, and assigns. . . hereby knowingly, fully, unconditionally, completely, and irrevocably forever releases [the Releasees, including Madison Springfield,] with respect to, any and all claims, actions, causes of action . . . based on, arising out of, or resulting from or relating, directly or indirectly . . . [to] this Agreement or *any amounts payable by* [Madison Springfield] *or its affiliates.*

(*Id.* at ¶ 5) (emphasis added). Moreover, Paragraph 6 provided that the Bonus Agreement "*supersedes* any and all prior agreements, arrangements and

understandings, written or oral, between Recipient and [Madison Springfield] with respect to the subject matter hereof." (*Id.* at ¶ 6) (emphasis added).

Notably, the Bonus Agreement does not define "affiliate." (*See* Doc. 42-1). When terms are not defined in a contract, Delaware courts look to dictionaries for assistance in determining the plain meaning of terms. *Lorillard Tobacco Co. v. Am. Legacy Found.*, 903 A.2d 728, 738 (Del. 2006). In determining the meaning of "affiliate," Delaware courts, citing Black's Law Dictionary and Merriam-Webster's Collegiate Dictionary, have found that affiliate means, among other things, (1) "an affiliated person or organization," or (2) "being close in connection, allied, associated, or attached as a member or branch . . . ." *Geier v. Mozido, LLC*, No. CV 10931-VCS, 2016 WL 5462437, at *6 (Del. Ch. Sept. 29, 2016) (citing Merriam-Webster's Collegiate Dictionary 21 (11th ed. 2003)); *see also* Black's Law Dictionary, 1446 (7th ed. 1999)).

The Court dismissed Plaintiffs' prior Complaint because it was unclear whether they had released their claims. (Doc. 29 at 9–12). Specifically, the Court found that it was unclear whether Mr. Everington and Mr. White were "affiliates" under the agreements because the complaint did not specify "whether Plaintiffs were employed by Madison Springfield or if Plaintiffs were employed by IAS." (*Id.* at 11). As such, the Court ordered Plaintiffs to file an amended Complaint to clarify their relationship with Madison Springfield. (*See id.*).

Plaintiffs have now filed their amended Complaint (Doc. 31), and the Court considers whether Plaintiffs have clarified their relationship with Madison

Springfield.  The Court turns to Delaware's statutory definition of employee to
determine whether Plaintiffs were classified as employees.  Delaware statute
defines "employee" as follows:

> "Employee" means every person in service of any corporation (private,
> public, municipal or quasi-public), association, firm or person, excepting
> those employees excluded by this subchapter, under any contract of hire,
> express or implied, oral or written, or performing services for valuable
> consideration. . . .

19 Del. Code § 2301(10).  Upon review of Plaintiffs' amended Complaint and the
exhibits thereto, the Court finds that Plaintiffs have shown that they were
employees of Madison Springfield and do not meet the definition of "affiliates".

For instance, Plaintiffs pleaded that Mr. Everington was employed as
Madison Springfield's Director of Research and Mr. White as Director of Analysis.
(Doc. 31 at ¶ 37).  These statements are corroborated by Madison Springfield's
organization chart, which is incorporated into the amended Complaint.  (Doc. 42-7).
The chart, titled "Team MSI GRAP Organization Chart", lists Mr. Everington as the
"research lead" and Mr. White as the "analysis lead."  (*Id.*).

Further, Mr. Everington and Mr. White pleaded that they attended meetings
as representatives of Madison Springfield, provided job training to Madison
Springfield employees, carried Madison Springfield business cards, used Madison
Springfield emails, and advised Mr. Riesen on contracts.  (Doc. 31 at ¶ 21).
Plaintiffs attached Mr. White's business card, which demonstrates that he was a
"principal" of Madison Springfield.  (Doc. 42-6).  The business card also lists his
Madison Springfield employee email.  (*Id.*).  Thus, the Court finds that Plaintiffs

12

have demonstrated sufficient facts to show that they may be classified as employees and that they do not meet the definition of "affiliates" under Delaware law.

Lastly, the Court considers a conflict in the record: whether Plaintiffs were owners or employees of Madison Springfield.  Plaintiffs claim that they "had an oral agreement with Riesen to work as partners to form and develop [Madison Springfield] into a successful business with the agreed upon vision that [Madison Springfield] would be sold at a profit in the future with the three men sharing in the proceeds."  (Doc. 31 at ¶ 2).  But the resolutions that increased their shares in Madison Springfield, which are incorporated into the amended Complaint, list Mr. Riesen as the "sole shareholder" of Madison Springfield.  (Docs. 42-4 at 1 & 42-5 at 1).  Here, the Court considers Texas law because Madison Springfield was formed in Texas.  Texas law provides that an employee "can be, and often is, also an equity owner in his or her employer company."  *Malone v. Patel*, 397 S.W.3d 658, 679 (Tex. App. 2012) (citing *Willis v. Bydalek*, 997 S.W.2d 798, 802–03 (Tex. App. 1999)).  Thus, the Court need not resolve the conflict of whether Plaintiffs were employees or owners to determine whether Plaintiffs have corrected the deficiencies in their prior Complaint.

Taking all the above facts as true at this stage of the proceedings, the Court finds that Plaintiffs have demonstrated sufficient facts to show that the Bonus Agreement does not bar Plaintiffs' claims.  Specifically, Plaintiffs pleaded sufficient facts to show that they may be classified as employees under the stock option

agreements.  Accordingly, the Court declines to dismiss Plaintiffs' amended

Complaint on the basis that the Bonus Agreement bars all claims.

## II.     The Court is unable to determine whether Plaintiffs' breach of fiduciary duty claim is barred.

Next, Mr. Riesen argues that Plaintiffs' breach of fiduciary duty claim is

barred by the economic loss rule, also known as the independent injury doctrine.

(Doc. 39 at 9–11).  Plaintiffs assert that they have stated a legally cognizable claim.

(Doc. 42 at 13–16).  The Court finds that Plaintiffs have failed to properly place Mr.

Reisen on notice of the claims against him.  Therefore, the Court dismisses the

amended Complaint for the reasons below.

"The economic loss rule generally precludes recovery in tort for economic

losses resulting from a party's failure to perform under a contract when the harm

consists only of the economic loss of contractual expectancy." *Chapman Custom

Homes, Inc. v. Dallas Plumbing Co.*, 445 S.W.3d 716, 718 (Tex. 2014) (citation

omitted).  A tort action is precluded where (1) the claim is for breach of a duty

created solely by contract rather than a duty imposed by law; and (2) the injury is

only the economic loss to the subject of a contract itself.  *Jim Walter Homes, Inc. v.

Reed*, 711 S.W.2d 617, 618 (Tex. 1986); *Howell Crude Oil Co. v. Donna Refinery

Partners, Ltd.*, 928 S.W.2d 100, 108 (Tex. App. 1996).  That said, the economic loss

rule does not bar all tort claims arising out of a contractual setting.  *Chapman

Custom Homes*, 445 S.W.3d at 718.  A party states a tort claim when "the duty

allegedly breached is independent of the contractual undertaking and the harm

suffered is not merely the economic loss of a contractual benefit."  *Id.*

14

Here, Mr. Everington and Mr. White state that "Risen's actions in depriving White and Everington of all the benefits of the [Madison Springfield] sale, constitute a course of conduct designed to harm [them]."  (Doc. 31 at ¶ 75).  While Mr. Riesen argues that this conduct is covered by the breach of contract claim, Mr. Everington and Mr. White claim that they have raised separate and independent grounds for their breach of fiduciary duty claim.  For instance, Plaintiffs' brief states that "Plaintiffs were left uncompensated for their numerous hours of hard work in developing [Madison Springfield] into a lucrative business."  (Doc. 42 at 13 (citing Doc. 31 at ¶ 36)).  However, Plaintiffs failed to incorporate this background fact into their breach of fiduciary duty claim.  One step further, the Court notes that Plaintiffs have failed to specify which, if any, of the background facts relate to each claim.

In its prior Order, the Court set forth the law regarding shotgun pleadings and warned Plaintiffs that their prior Complaint may be one.  (Doc. 29 at 15–16).  Specifically, Mr. Riesen argued that Plaintiffs' complaint contained multiple counts that adopted the allegations of all preceding counts.  (Doc. 17 at 14–15).  The Court found merit in Mr. Riesen's argument and "encourage[d] Plaintiffs to amend such that it is clear *which facts pertain to which count*."  (Doc. 29 at 16 (emphasis in original)).  Rather than fixing this issue to specify which background facts pertain to each claim, Plaintiffs omitted the paragraphs that describe which facts pertain to which count.  Because of this omission, the Court is unable to determine which facts

pertain to each claim.[5]  While Mr. Riesen did not raise this issue in his motion to dismiss, this Court has a *sua sponte* obligation to act when a plaintiff fails to give a defendant adequate notice of the claims against him.  *Johnson Enters. of Jacksonville, Inc. v. FPL Grp., Inc.*, 162 F.3d 1290, 1333 (11th Cir. 1998) (noting a district should act *sua sponte* to define the issues at the earliest possible stage).  Further, the failure to give a defendant adequate notice drains judicial resources and "divert[s] [those] resources into disputes that are not structurally prepared to use those resources efficiently."  *Wagner v. First Horizon Pharm. Corp.*, 464 F.3d 1273, 1279 (11th Cir. 2006) (quotation omitted).

Accordingly, the Court cannot determine which background facts pertain to each claim, and the amended Complaint must be dismissed in its entirety.  The Court will allow Plaintiffs one last opportunity to file an amended Complaint to cure the pleading deficiencies outlined in this Order.[6]

*(rest of page intentionally left blank)*

---

[5] Upon review of Plaintiffs' fraudulent misrepresentation or inducement claim, the Court notes that the amended Complaint fails to specify which background facts pertain to that claim as well.  (*See* Doc. 31 at ¶¶ 17–19).

[6] Lastly, the Court addresses Mr. Riesen's argument that Plaintiffs improperly comingled breach of contract claims.  The Court finds that Plaintiffs' comingling of claims did not wholly violate Federal Rule of Civil Procedure 10(b) because those claims arose out of the same transaction or occurrence (*i.e.* Plaintiffs alleged employment with Madison Springfield).  *See Cont'l 332 Fund, LLC v. Albertelli*, 317 F. Supp. 3d 1124, 1138 (M.D. Fla. 2018).  However, it did violate Rule 10(b) in so far as it did not give Defendant adequate notice of the claims against him for the reasons listed above.  *See id.; see also supra* Section II.

## CONCLUSION

For the foregoing reasons, it is **ORDERED** that:

(1) Defendant Mr. Riesen's Motion to Dismiss (Doc. 39) is **GRANTED in part** to the extent that the amended Complaint (Doc. 31) is dismissed without prejudice. The Court allows Plaintiffs one last opportunity to fix the pleading deficiencies outlined in this Order. Plaintiffs are also encouraged to fix any other substantive deficiencies.

(2) Plaintiff is **DIRECTED** to file an amended complaint no later than August 26, 2025. Failure to do so will result in the closure of this case without further notice. Plaintiffs may not assert any new claims upon the filing of a second amended complaint.

(3) The Court is aware that the parties are due to mediate shortly and strongly suggests that the parties reconsider whether a settlement is in their best interests. If the parties notify the Court in a joint filing that they would like to engage in good-faith settlement negotiations following mediation, the Court will both stay the deadlines in this case and offer a U.S. Magistrate Judge to conduct a settlement conference at no cost to the parties. Within three weeks from the filing date of this order, the parties are to file a joint notice requesting such. The notice is not to identify if a particular party opposes a settlement conference. It is simply to note that the parties jointly request a settlement conference, and that the parties jointly request the Court to appoint a U.S. Magistrate Judge to conduct a

17

settlement conference.  Having carefully reviewed this case, the Court urges the parties to consider amicably settling this matter.  That said, the Court will proceed in whatever manner the parties request.  The Court will enter an amended case management scheduling order.

**ORDERED** in Tampa, Florida, on August 10, 2025.

JOHN L. BADALAMENTI
UNITED STATES DISTRICT JUDGE