IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA

ALEXIS EVERINGTON
and RICHARD WHITE

      Plaintiffs,

v.

TIMOTHY J. RIESEN

      Defendant.

Case No.  8:23-cv-02386-JLB-NHA

## SECOND AMENDED COMPLAINT

Plaintiffs Alexis Everington and Richard White allege in support of their Second Amended Complaint against Timothy J. Riesen as follows:

## INTRODUCTION

1.    Alexis Everington ("Everington") and Richard White ("White") met while working together for the same company in England.  During this time, they also met Timothy J. Riesen ("Riesen"), who worked for a different company but in the same line of work.  After Everington and Riesen left their respective employers, they began discussing starting a business supporting public and private organizations seeking insights into foreign markets, competitors, and industry trends.  At some point near the beginning of these discussions, Everington and Riesen included White about starting a business.  However, Riesen maintained that it would not be possible for Everington and White, given that they there were not citizens of the United States, to

be owners of a business securing and implementing work of the sensitive nature that they had previously worked on for the United States government. In addition, the Operational Security (OPSEC) requirements of the sensitive work undertaken also made it wise for Everington and White to maintain a less visible role with Madison Springfield Inc. ("MSI" or "Madison Springfield"). Everington and White agreed with the latter and knew no better regarding the former. As such, Riesen established himself as the sole owner of Madison Springfield in Texas.

2.      Everington and White had an oral agreement with Riesen to work as partners to form and develop MSI into a successful business with the agreed upon vision and aspiration that MSI would be sold at a profit in the future with the three men sharing in the proceeds.  Essentially, the concept of MSI started with three men and a laptop without the assurances that the idea of the company would ever be marketable to clients or profitable.

3.      Everington and White therefore agreed with Riesen to continually promote MSI's work and name in the marketplace.

4.      Everington and White would also use their unique skill set and invaluable contacts in foreign markets to develop MSI into a profitable company.  To compete for and complete secretive United States defense contracts, Everington and White each had their own set of priceless contacts only known to them in various foreign countries. The combined knowledge of Everington and White created a network of intelligence gathering for the United States government and clients.

5.      Gathering intelligence information was done by a process known as stove piping.  Stove piping is essential in gathering intelligence information especially in dangerous and hostile foreign countries, creating a dynamic to protect the identity of people not only on the ground doing research and obtaining the information, but also for the protection of Everington and White.  In other words, there is a hierarchy of sharing information vertically without sharing it across different levels or people.  This dynamic helped ensure the protection of the people on the ground gathering intel in countries antagonistic to the United States.

6.      As indicated, during the initial stages of MSI, none of the men were sure that MSI would be successful.  Consequently, Everington and White were not concerned about not having a formal arrangement with Riesen regarding their partnership.  Everington and White also trusted Riesen on a professional and personal level as all three shared a long friendship.  Moreover, to conduct the type of work required to perform these types of contracts the men were undertaking required a high level of trust among the three men.  These men never questioned that the other party would not be performing their critical roles in developing MSI into a successful business.  After winning and completing various defense government contracts, the men began to realize that MSI was able to turn a profit.

7.      To ensure that Everington and White could benefit from the arrangement while supposedly preserving the competitiveness of MSI and the security of the work undertaken, Riesen agreed to provide Everington and White with stock options in

3

MSI, allowing each to monetize their efforts for the newly formed company upon a change of control of MSI.

8.    Riesen, White, and Everington memorialized their arrangement in 2013 with Everington and White each receiving stock options totaling 10% of outstanding and issued common stock.  As MSI continued to be more successful, again, the men amended and memorialized their arrangement in 2016 when White and Everington each received stock options equaling 25% of the outstanding and issued common stock of MSI.

9.    At this point in time due to the professional and personal trust among the three men, Everington and White never questioned that Riesen would not honor the agreement to share in the proceeds of a future sale of MSI.

10.    Based on Riesen's promises, White and Everington worked cooperatively with Riesen for years building Madison Springfield into a valuable enterprise with lucrative government contracts.  At all times, White and Everington believed Riesen would honor his commitments to them.  Riesen acknowledged and accepted his fiduciary duty by these actions.

11.    In 2022, after a period of negotiations, Riesen agreed to sell Madison Springfield to a third party. Riesen failed to give White and Everington formal notice of the sale, failed to disclose the deal terms, and never gave White and Everington an opportunity to exercise their options to each acquire 25% of Madison Springfield's stock before the sale closed as required by their stock option agreements.

12.     When confronted by White and Everington about the sale, Riesen has repeatedly refused to transparently disclose the terms of the sale. Instead, Riesen sought to buy off White and Everington at a substantial discount and promised to make future payments but will not reduce those promises to any enforceable terms. As such, White and Everington have no choice but to commence this action to recover what is rightfully theirs: half the proceeds from the sale of Madison Springfield.

## JURISDICTION

13.     The Court has jurisdiction over this action under 28 U.S.C. § 1332(a)(2) in that the amount in controversy in this matter exceeds $75,000.00 and this is a civil action between a citizen of the State of Florida and citizens of the United Kingdom and a resident Monaco who are not permanent residents of the United States nor domiciled in the State of Florida.

## VENUE

14.     Venue is proper in this district under 28 U.S.C. § 1391(b)(1), in that Defendant Riesen resides in this District.

## PARTIES

15.     Plaintiff Richard White is an individual who resides in the United Kingdom and is a citizen of the United Kingdom.

16.     Plaintiff Alexis Everington is an individual who resides in Monaco and is a citizen of the United Kingdom

17.   Defendant Timothy J. Riesen is an individual who resides in Sarasota, Florida, and is a citizen of the State of Florida.

## FACTS

18.   Prior to 2011, Riesen and Everington began working together on projects while they were employed at separate companies operating in the United States defense sector.

19.   In 2011, Everington left his employer. White remained to finish a number of legacy projects with Riesen.

20.   After leaving, Everington and Riesen discussed establishing a new company as Riesen also believed (correctly) that work at his employer would draw to an end. Everington established a company in the United Arab Emirates called International Advisory Services ("IAS").

21.   The new business would seek to do the same type of contracts with the same types of clients (notably the U.S. government defense sector).

22.   Riesen advocated against joining IAS, representing that if the new venture was to successfully compete for government contracts in the United States the entity through which the work would be done needed to be formed in the United States. Riesen also raised concerns about the formal ownership structure of the new venture including individuals who were not United States citizens. As Riesen explained, the United States government would find foreign firm ownership disqualifying for the type of government contracts the new entity would seek to win.

23.    Trusting Riesen's representations about the viability of obtaining United States government contracts through a foreign firm, Everington and White agreed that the new venture would be formed separately in the United States as MSI and that Riesen would formally own 100% of the new venture but that some other way of compensating the two other partners could be found.

24.    After the formation of MSI, Everington, Riesen, and White worked cooperatively to build up Madison Springfield operating as partners would in a partnership.

25.    As indicated, in the beginning, Everington and White were not concerned about having their arrangement formalized because none of the men were certain that Madison Springfield would be able to win government contracts, let alone be profitable.

26.    While building MSI, White and Everington would attend meetings as representatives of Madison Springfield, provide job training to MSI employees, carry business cards identifying them as principals of MSI, use MSI emails, discuss all work opportunities with Riesen, provide Riesen advice on contracts and would generally do whatever was necessary for MSI to meet its contractual obligations with its customers. True and correct copies of Plaintiffs' business cards are attached hereto as **Exhibits 1 and 2**.

27.    Riesen would confide in Plaintiffs about the intimate details of the workings of MSI including the status of negotiations during the bids for new contracts.

Riesen would also discuss with Plaintiffs and would receive advice about the feasibility and costs of various contracts for MSI.

28.     Everington and White are well-known in foreign markets, have various foreign contacts, and are knowledgeable about various foreign markets that made it possible for Madison Springfield to compete for various contracts that were sensitive in nature.

29.     Riesen would have been unable to develop Madison Springfield's business and complete various contracts for its customers had it not been for his partnership with Plaintiffs due to their unique skill set and expertise.

30.     In essence, while Riesen was the face of Madison Springfield to existing and potential customers in the United States, Plaintiffs were the backbone of the company working on obtaining intelligence on the ground level in foreign countries. Riesen did not have the type of foreign network to conduct the stove piping that Everington and White maintained.

31.     IAS therefore was merely an entity, a vehicle in which Plaintiffs were to be paid for their work performed for MSI's contracts. Everington became the director of International Advisory Services. White provided independent contract work for International Advisory Services. White has no control over IAS.

32.     IAS was also the vehicle in which consultants were paid for their work on the ground obtaining the requisite information for Madison Springfield's contracts. Riesen regularly relied on IAS to provide money to be paid to consultants to begin new contracts. On the ground consultants often required to be paid up front due to

8

the sensitive nature of the work being performed. Therefore, IAS paid consultants up front prior to being paid by MSI for the completed contracts. Fundamentally, Plaintiffs put themselves at financial risk in paying ground-level consultants up front. However, Plaintiffs never questioned that Riesen would not pay them as they trusted him. Riesen, Everington and White had an understanding that MSI would eventually pay Everington and White through IAS for the work completed after being paid by the client for the completed contract.

33.    As Madison Springfield continued to be awarded more contracts, purchase orders were set in place to keep track of money paid to Plaintiffs through IAS. The purchase orders permitted all parties to keep track of monies paid and owed to Plaintiffs for each of Madison Springfield's contracts they completed.

34.    White and Everington would carry out the contracts Madison Springfield was awarded through IAS. This had the added perceived benefit of protecting the operational security of Madison Springfield projects, particularly when some of these became of an increasingly sensitive nature and/or occurred in hostile foreign countries. Further, White and Everington believed Riesen's representations that this was the mechanism in which they had to take in order to compete and complete contracts sensitive in nature in the United States defense sector. Plaintiffs, therefore, held the belief that they were partners with Riesen.

35.    To partially formalize the understanding Riesen, White, and Everington had reached prior to Madison Springfield's formation, White and Everington each received stock options in Madison Springfield in 2013 that gave them each an option

to purchase 10% of its stock at a change in control event for the company ("2013 Stock Option Agreements"). True and correct copies of the 2013 Stock Options Agreements have been attached hereto as **Exhibits 3 and 4**.

36.    The 2013 Stock Option Agreements obligated MSI (and effectively Riesen as its sole owner) to notify White and Everington of a change in control event so that they could exercise their stock options.

37.    White and Everington were disappointed at the percentage of stock options allocated to them in 2013. Although disappointed, White and Everington were not entirely concerned due to the uncertainty of MSI's future.

38.    On October 15, 2013, Madison Springfield extended an offer of employment both to White and Everington as principals with an effective date of November 1, 2013. True and correct copies of the employment offers have been attached hereto as **Exhibits 5 and 6**. Everington and White each signed their offers of employment. Riesen signed the offers as the Managing Principal of Madison Springfield.

39.    Because of the inner workings of all three men, Madison Springfield was turning into a profitable company. After continually winning bids to perform contracts due in large part to Plaintiffs' hard work and expertise, White and Everington pushed Riesen to increase the percentage of stock options allocated to them to conform to the pre-formation agreement.

40.    Riesen acquiesced in 2016 causing Madison Springfield to restate the stock option award to White and Everington to increase their options to 25% each of

the company's stock ("the 2016 Stock Option Agreements"). True and correct copies of 2016 Stock Option Agreements have been attached hereto as **Exhibits 7 and 8**. These agreements demonstrate that Everington and White together had stock options for 50% of Madison Springfield's stock.

41.    The stock options signified the invaluable benefits and expertise Plaintiffs brought to developing MSI into a successful enterprise. The Stock Option Agreements named Plaintiffs as employees of MSI. These agreements further underscored their oral agreement with Riesen to work as partners in the development of Madison Springfield.

42.    Satisfied with Riesen having purportedly followed through to memorialize the terms of the pre-formation agreement to work as partners, White and Everington continued to devote their time, talent, and efforts to maximizing the value of MSI with the understanding that together they would receive half of the sale profits in the future.

43.    Consequently, during Madison Springfield's development, Everington and White held themselves out as partners of MSI and continued to promote MSI's name in the industry. In other words, Plaintiffs promoted MSI as the company performing the contracts sensitive in nature rather than IAS. Everington would also on occasion appear for presentations on behalf of MSI at certain conventions held in the United States.

44.    Plaintiffs dedicated numerous hours and years as partners with Riesen in developing MSI into a lucrative enterprise with many of those hours being

uncompensated.  The motivation behind Everington and White's perseverance in committing tireless labor to developing MSI was with the vision of selling the company for a sizable profit.

45.    Plaintiffs also provided various input into the development of contract bids for clients, including being named on company materials for certain proposals as required by certain clients.  For example, for the Global Research Assessment Program, Madison Springfield's chart listed Everington as the Research Lead with Richard White as the Analysis Lead, demonstrating their integral role with the company.  A true and correct copy of the chart is attached hereto as **Exhibit 9**. Plaintiffs' expertise was also listed in the proposal materials.  *Id.*

46.    Plaintiffs' devotion to their work and proficiency with their research networks were integral parts of Madison's Springfield's continual business growth.  In this respect, MSI's research projects were largely performed by Everington and White.

47.    Due to Plaintiffs' hard work and expertise, Madison Springfield obtained numerous and lucrative government contracts that were sensitive in nature.  Those contracts were performed and completed by Plaintiffs.

48.    Plaintiffs and Riesen continued with their oral agreement to work as partners in developing Madison Springfield into a lucrative business to sell the company for a sizable profit in which they would all share in the proceeds.

49.    Riesen treated Plaintiffs as his partners by working collaboratively with them in attempting to reach their objective by routinely discussing the best method to

improve their business for their customers and potential customers for the continual growth of Madison Springfield.

50.    Around November 2020, Riesen then informed White and Everington that he wanted to sell MSI.

51.    Riesen represented to Plaintiffs that Madison Springfield was well positioned to capture a sale figure of $40-$50 million.  A true and correct copy of Wire communications is attached hereto as **Exhibit 10**.[1]

52.    During this time, Riesen reiterated the agreement they previously reached and acknowledged the critical role White and Everington played in growing the company.  In other words, Madison Springfield's success was due to the partnership and hard work among the three men.

53.    Riesen relayed he would engage an investment banker to help facilitate a sale.

54.    Riesen discussed with Everington and White potential investment bankers to aid in the sale.  A true and correct copy of Wire communications is attached hereto as **Exhibit 11**.  The Chertoff Group was retained by Madison Springfield after Riesen discussed various consultants with Everington and White.

55.    During the winter and early spring of 2021, Riesen relayed generally to Everington and White that there were many interested buyers of the company.

---

[1] The parties often discussed matters on the Wire platform.  The Wire platform is a secure messaging platform. At times, there is no date on the communications.  Personal and confidential information have been redacted on the communications.

56.    Around this time, Riesen made a decision not to distribute excess cash received on a project to IAS to make Madison Springfield look more valuable to prospective purchasers.

57.    When confronted about this decision by Everington, Riesen explained a higher sale price would benefit Everington and White given their stakes in the company.

58.    Riesen continued to discuss with Plaintiffs potential buyers. A true and correct copy of Wire communications is attached hereto as **Exhibit 12**.

59.    By late Spring 2021, Riesen was starting to downplay the likely sale number to Everington and White suggesting the sale price would range from $10 to $25 million.

60.    Riesen continued downplaying the likely sale number through June 2021 in his generic communications with Everington and White blaming poor twelve-month financials for the offers coming in so much lower than the original estimated sale price.

61.    Riesen's own words demonstrate that Plaintiffs were his partners. When discussing the sale with Plaintiffs, Riesen would use terms that a potential buyer would "want us" or "if we do sell" indicating he meant all three men that were the center of Madison Springfield. True and correct copies of Wire communications are attached hereto as **Exhibits 13 and 14**.

62.    Riesen continued to involve Plaintiffs in discussions of potential buyers for the company, including the pros and cons for each possible buyer. At one-point,

Blue Delta was named as a potential buyer. A true and correct copy of Wire communications is attached hereto as **Exhibit 15**.

63.    As time progressed in 2021, Riesen increasingly became less transparent regarding a potential sale, indicating that Madison Springfield would sell for an amount far less than originally projected.

64.    Riesen then informed Plaintiffs that a potential buyer was interested in acquiring Madison Springfield. Riesen kept Plaintiffs largely in the dark about the terms of the merger.

65.    However, Plaintiffs, based upon Riesen's statements and promises, continued to place trust in Riesen that he would honor their partnership and the stock option agreements.

66.    On or about February 2022, Riesen informed Everington in broad terms of the offer from the prospective purchaser. Riesen admitted that at that purported sale number White and Everington were each due $3 million. A true and correct copy of Wire communications is attached hereto as **Exhibit 16**. Riesen discussed with Plaintiffs about being locked in to having to continue to work for Madison Springfield for eighteen months after the merger, but then IAS could stop supporting the company and the men could start a new company. *Id.*

67.    Riesen kept Everington and White generally up to date as the prospective deal worked through various stages of activity. However, Riesen never provided Everington and White with any negotiated terms of the sale prior to the merger.

Plaintiffs therefore were forced to rely on Riesen's representations concerning the prospective sale.

68.    Riesen continued to treat Plaintiffs as his partners by discussing his fear of the potential of the acquiring company from pulling the sale. A true and correct copy of Wire communications is attached hereto as **Exhibit 17**.

69.    In April 2022, Riesen represented to Plaintiffs that the merger may not be a good deal with the acquiring company. A true and correct copy of Wire communications is attached hereto as **Exhibit 18**. Despite Riesen having knowledge regarding potential issues with the acquiring company, Riesen continued with the merger.

70.    Prior to the merger, Riesen did not provide Plaintiffs with the complete negotiated terms of the merger or the underlying documents pertaining to the merger.

71.    Notwithstanding his lack of transparency, Riesen continued to provide Plaintiffs with general information about the merger. A true and correct copy of Wire communications is attached hereto as **Exhibit 19**.

72.    Riesen falsely represented the full and complete terms of the merger agreement that was designed to deceive Plaintiffs regarding the rightful amount owed to them.

73.    Riesen falsely represented the full and complete terms of the merger agreement in order to retain a greater portion of the sales proceeds for himself.

74.    By May 2022, the deal had reached a point where acquisition documents were being drafted such that Riesen persuaded Everington to have IAS sign a Bonus

Agreement. A true and correct copy of the Bonus Agreement is attached hereto as **Exhibit 20**. The Bonus Agreement was a mechanism in which White and Everington were to receive $1 million each when the transaction closed. Riesen signed the agreement as Chief Executive Officer of MSI.

75. The Bonus Agreement was between MSI and IAS. Everington signed the Bonus Agreement as a director on behalf of IAS on May 10, 2022.

76. It is upon information and belief that the acquiring company drafted the Bonus Agreement and required it to be signed for the merger to occur with Madison Springfield. A true and correct copy of Wire communications is attached hereto as **Exhibit 21**. It is upon information and belief this was an attempt on the part of the acquiring company to extinguish Plaintiffs' rights in MSI. It is upon information and belief Riesen was aware of this ploy but represented to Plaintiffs it was to cover him to demonstrate he was not avoiding taxes. *Id.*

77. White thought the Bonus Agreement to be odd and felt rushed about it. However, White trusted Riesen to honor their agreements to share in half of the proceeds from the merger.

78. Everington felt pressure to sign the Bonus Agreement due to the deterioration of the relationship with Riesen, but he wanted to ensure he and White would receive some sort of payment from the merger.

79. Riesen also represented that he would pay Plaintiffs through IAS an additional $4 million. Apparently, this was Riesen's attempt to quell the Plaintiffs' inquiries regarding the actual monies earned by Riesen upon the merger.

17

80.    Riesen falsely represented the full and complete terms of the merger agreement to induce Everington to sign the Bonus Agreement.

81.    Up until this point, Riesen had not shared the sale or merger agreements with Everington and White.

82.    Based on Riesen's false statements hiding the full and complete terms of the merger agreement, Riesen induced Everington into signing the Bonus Agreement.

83.    Everington signed the Bonus Agreement and justifiably relied on Riesen's false statements concerning the merger of MSI.

84.    Riesen's continued misrepresentations of the full terms of the merger agreement were knowingly false or made with reckless disregard for their truth, made with the intent to deceive Plaintiffs, induced Plaintiffs to rely on Riesen's representations pertaining to the sale, induced Everington into signing the Bonus Agreement, and Plaintiffs reasonably relied on those false statements to their detriment.

85.    Riesen relayed during the rest of May that the transaction would close as soon as the merger documents were approved and accepted by the State of Texas and that funds would be released shortly thereafter.  The expected approval date was May 31, 2022.[2]

---

[2] Plaintiffs have learned that Madison Springfield was recently acquired by another company and is no longer part of the original acquiring company from 2022.  Plaintiffs submit that this new acquisition is relevant to an accounting of Riesen's assets.

86.     Riesen unilaterally merged Madison Springfield with the acquiring company without providing complete disclosure of the merger's terms to Plaintiffs.

87.     Riesen unilaterally sold his interest and Plaintiffs' interests during the merger without disclosing to Plaintiffs the full terms of the merger.

88.     Upon information and belief Riesen intentionally made false statements or with reckless disregard for their truth regarding the shares of stock he and others were to receive upon the merger of MSI with the acquiring company including the assigned value of the stock prior to and at the time of the merger.

89.     Everington and White relied to their detriment on Riesen's false representations and did not receive the full benefit of the bargain of Madison Springfield's merger with the acquiring company.

90.     On or about June 3, 2022, Riesen informed Everington and White that Riesen would wire the $2 million and not the acquiring entity.

91.     Everington found that odd, especially as Everington and White were entitled to acquire 50% of the equity in MSI ahead of the merger and participate in the transaction directly under the terms of the 2016 Stock Option Agreements and started pushing to see the actual merger documents. Riesen continued to keep secret the terms of the merger.

92.     Riesen sent the $2 million wire to IAS on June 7, 2022. But he refused to send the actual merger agreement because of a purported non-disclosure agreement. Riesen continued to keep Plaintiffs in the dark about the actual amount received for the merger of Madison Springfield.

93.    None of the parties were under the assumption that the Bonus Agreement would extinguish Plaintiffs' rights by receiving at a minimum the additional $4 million Riesen promised to pay after the merger of MSI.   Riesen, therefore, continued to promise to pay Plaintiffs the additional monies owed to Plaintiffs.

94.    The Bonus Agreement did not extinguish any rights by Plaintiffs seeking a full amount rightfully owed to them.

95.    Despite Plaintiffs' repeated requests in 2021 and through 2022 to know the full terms of the merger agreement or to see the agreement, Riesen rebuffed their requests.

96.    Riesen never provided Everington and White with the details of the merger.

97.    Riesen never gave Everington and White an option to exercise their rights per the Stock Option Agreements upon the merger.

98.    Riesen never gave Everington and White the option to receive stock in the acquiring parent company.

99.    Riesen never gave Everington and White the option to decline the merger offer by the acquiring company.

100.    Riesen never gave Everington and White the option to have another buyer purchase Madison Springfield or the opportunity to look for another more profitable buyer.

101.    Riesen never gave Plaintiffs the option to find another buyer which would permit Plaintiffs to keep working as partners with Riesen.

102.    Riesen continually represented with the intent to mislead the actual terms of the merger, by telling Everington and White that the sale price was $12 million in cash and that each were owed $3 million dollars.  A true and correct copy of Wire communications is attached hereto as **Exhibit 22**.

103.    Upon information and belief, Riesen continually mispresented the total sale price prior to and after the merger, retaining a greater share in the full benefit of the merger.

104.    Despite repeated attempts by Everington and White, Riesen never disclosed the actual sales terms of the merger.

105.    After the merger, Riesen continued to provide a generic description of the deal terms but would not disclose the underlying transaction documents.

106.    After the merger, Riesen then provided empty promises to personally show Plaintiffs the transaction documents, but he never kept his promises.

107.    Riesen had Everington and White both sign a non-disclosure agreement to receive generic information regarding the merger.

108.    Everington and White in August 2022 received a letter from Riesen's counsel generally setting forth the terms of the merger.  In September 2022, Riesen's attorney supplemented the letter.  The supplemented letter while providing the terms of the merger misled Everington and White to the total transaction terms of the merger including the actual sales price of MSI.

Notably, the letter indicated that Riesen agreed to pay Plaintiffs an additional $4 million.  A true and correct copy of the first page of the letter is attached hereto as **Exhibit 23**.[3]

109.  Despite having Plaintiffs sign a non-disclosure agreement, Riesen continued to refuse the repeated requests from Everington and White to see the underlying merger documents.

110.  Upon information and belief, Riesen has misrepresented the actual deal terms and deprived White and Everington of what they are entitled to: their respective 25% shares of the value obtained from the sale of Madison Springfield.  Consequently, Plaintiffs' receipt of $2 million and promise of additional $4 million was not a representative share of the amount owed to them due to the company's merger.

111.  Plaintiffs lost the right to evaluate and possibly match the merger's terms with a potential buyer.

112.  Riesen prevented Plaintiffs from refusing to turn down or complete the merger due to failing to disclose the complete terms of the sale.

113.  Riesen prevented Plaintiffs from profiting from a sale from a more profitable buyer.

114.  Riesen's actions disrupted the business operations and partnership with Plaintiffs.

---

[3] Due to the confidential nature of the terms of the merger agreement, only the first page of the attorney's letter has been included.

115. Plaintiffs have suffered damages including the loss of partnership control and partnership expectations.

116. To date, at a minimum, Riesen has failed to pay Plaintiffs the $4 million he promised to pay them. Upon information and belief, Riesen has hid the actual sale terms of the merger of MSI, resulting in Plaintiffs being owed a far greater amount than $4 million.

## COUNT I – BREACH OF FIDUCIARY DUTY

117. White and Everington reposed in Riesen, and Riesen knowingly accepted, Plaintiffs' trust and confidence regarding the formation of the business conceived by all three that became Madison Springfield.

118. White and Everington reposed in Riesen, and Riesen knowingly accepted Plaintiff's trust and confidence in the partnership in developing Madison Springfield.

119. White and Everington trusted Riesen on a personal and professional level.

120. White and Everington worked alongside Riesen as partners with the trust and understanding of building Madison Springfield into a successful business enterprise with the vision of selling the company for a sizeable profit.

121. The three men had an agreement that after Madison Springfield became a lucrative business, they would sell the company for a substantial profit and all three would share in the sale proceeds.

122.    White and Everington trusted Riesen that their hard work much left uncompensated would eventually be realized upon a sale or merger of Madison Springfield.

123.    Riesen breached a duty to Plaintiffs and betrayed their trust by not acting in their interests or in the partnership interests prior to and during the sale of Madison Springfield.

124.    White and Everington relied on Riesen to act in their best interests, vis-á-vis their oral partnership agreement to always be forthright regarding any potential sale or merger of Madison Springfield.

125.    White and Everington relied on and trusted Riesen to be forthright about all material terms of the merger of Madison Springfield.

126.    White and Everington relied on and trusted Riesen to share in half of the proceeds generated from any sale of MSI, the business that all three created and built.

127.    Riesen manipulated Plaintiffs' trust and reliance for his own personal gain.  Riesen continually hid the company's sales terms from Plaintiffs before and after the merger.

128.    Plaintiffs dedicated numerous hours and years as partners with Riesen in developing Madison Springfield into a lucrative enterprise with many of those hours being uncompensated.

129.    Upon information and belief Riesen breached his fiduciary duty to Everington and White by intentionally making false statements or with reckless disregard for their truth regarding the shares of stock he and others were to receive

24

upon the merger of MSI with the acquiring company including the assigned value of the stock prior to and at the time of the merger.

130.    Everington and White relied to their detriment on Riesen's false representations and did not receive the full benefit of the bargain of Madison Springfield's merger with the acquiring company.

131.    Riesen's actions, in depriving White and Everington of the full benefits of the Madison Springfield sale, constitute a course of conduct designed to harm White and Everington.

132.    Upon information and belief, Riesen retained a greater profit from the merger of MSI unbeknownst to Plaintiffs prior to and during the merger of MSI.

133.    Riesen owed a duty of loyalty and care to Plaintiffs of no self-dealing regarding the merger's terms.

134.    Riesen owed a duty of full disclosure to Plaintiffs of the merger's terms.

135.    Riesen owed a duty of care to provide a full financial account of the merger to Plaintiffs.

136.    Riesen's failure to fully disclose the merger's terms and failure to provide full financial accounting for the transaction, breached a fiduciary duty to Plaintiffs.

137.    Upon information and belief, Riesen breached his fiduciary duty to Plaintiffs by failing to act in the best interests of Plaintiffs by entering into an agreement in which Plaintiffs were prevented from exercising their stock options in Madison Springfield or obtaining stock in the acquiring company upon the merger.

138.    Riesen breached a duty of care and loyalty to Plaintiffs by failing to act in the best interest of the partnership, but rather solely participated in the merger for his own personal gain by retaining a larger amount in the sale.

139.    Riesen's actions of failing to disclose the merger's terms and self-dealing caused harm to the partnership.

140.    Upon information and belief Riesen breached a fiduciary duty owed to Plaintiffs by never fulfilling his promises and not sharing in the agreed-to proceeds of the merger.

141.    Riesen never gave Everington and White the option to exercise their stock option rights at the time of the merger.

142.    Riesen never gave Everington and White the option to receive stock in the acquiring parent company.

143.    Riesen never gave Everington and White the option to decline the merger offer by the acquiring company.

144.    Riesen never gave Everington and White the option to have another buyer purchase Madison Springfield or the opportunity to look for another more profitable buyer.

145.    Riesen never gave Plaintiffs the option to find another buyer which would permit Plaintiffs to keep working as partners with Riesen.

146.    Upon information and belief, Riesen breached a fiduciary duty to Plaintiffs by gambling on a deal with the acquiring company that may have devalued Plaintiffs' rightful shares in MSI and devalued MSI's value.

26

147.    Upon information and belief, Riesen breached his fiduciary duty to Plaintiffs despite having knowledge of potential problems of the acquiring company and placed MSI at financial risk by continuing with the merger.

148.    Because of Riesen's actions, Everington and White were prevented from working as partners with Riesen to further develop Madison Springfield.

149.    Riesen's actions described herein have at all relevant times been willful and/or knowing.

150.    As a direct and proximate result of the actions of Riesen alleged herein, White and Everington have suffered damage.

151.    Due to Riesen's breach of his fiduciary duty to Plaintiffs, Plaintiffs are entitled to a disgorgement of any profits retained by Riesen from the merger.

152.    Due to Riesen's breach of his fiduciary duty to Plaintiffs, Plaintiffs are entitled to a full financial accounting of the proceeds of the merger.

153.    Due to Riesen's breach of his fiduciary duty to Plaintiffs, Plaintiffs are entitled to an imposition of a constructive trust in Riesen's profits from the merger.

154.    By reason of the foregoing, Defendant Riesen is also liable to Plaintiffs for compensatory damages in an amount in excess of $75,000.00 as well as punitive damages and any other relief this Court determines is just and proper.

## COUNT II - BREACH OF AGREEMENTS

155.    Riesen, Everington and White had a valid oral agreement to work together as partners in the formation and building of MSI into a lucrative business with the end goal of selling the business for a profitable margin.

156.    Under Texas law, oral agreements are valid and enforceable.

157.    Riesen, Everington, and White agreed to share in the proceeds of the sale or merger of MSI.  Therefore, Everington and White were each to receive 25% of the value derived from any sale or merger of MSI.

158.    Riesen memorialized this oral understanding through various communications including emails and wire messages exchanged with Everington and White.

159.    At all material times, Plaintiffs rightly believed they were partners with Riesen.

160.    From the inception of MSI, Plaintiffs continued to perform under the oral partnership agreement by continually working to provide the best research products for Madison Springfield's clients.

161.    Riesen received a benefit under the oral agreement, namely, Plaintiffs' expertise, unique skill set, contacts and work that developed MSI into a profitable business.

162.    When the relationship among the parties was deteriorating due to Riesen's non-transparency of the merger, Riesen continued to receive the benefit of Plaintiffs' expertise and hard work as Plaintiffs continued to work and complete projects well after the merger.

163.    Riesen breached this oral partnership agreement by solely conducting the sale of MSI and hiding the actual and material terms of the sale from Plaintiffs.

28

164.   Riesen prevented Everington and White from the opportunity to refuse the merger with the acquiring company.

165.   Riesen prevented Everington and White from seeking other potential and/or more lucrative buyers for Madison Springfield.

166.   Riesen prevented Everington and White from exercising their stock options rights upon a change of control of Madison Springfield as evidenced in the Stock Option Agreements.

167.   Riesen rebuffed any attempts by Everington to help with the merger, including discussing the merger with the acquiring company.

168.   Riesen prevented Everington and White from participating in the merger transaction and ultimately receiving their respective shares of the profit from the sale proceeds or shares in stock in the acquiring company.

169.   At no time did Plaintiffs consider the Bonus Agreement to extinguish their rights to receive additional money that was owed to them for their work and development of MSI.

170.   Upon information and belief Riesen breached the oral partnership agreement with Plaintiffs through his false statements or with reckless disregard for their truth regarding the shares of stock he and others were to receive upon the merger of MSI with the acquiring company including the assigned value of the stock prior to and at the time of the merger.

171.   Riesen's breach of the oral partnership agreement was the proximate case of Plaintiffs' damages.

172.   Plaintiffs are entitled to half of the shares of stock of the acquiring company or an amount equivalent thereto at the time of the merger.

173.   Riesen has failed to pay at a minimum the remaining amount promised and owed to Plaintiffs of an additional $4 million to Plaintiffs as evidence in his attorney's letter from September 2022.

174.   Alternatively, Plaintiffs may be considered employees of MSI. Riesen provided Plaintiffs with Stock Option Agreements in which Everington and White would each derive 25% of the value of the sale of MSI.

175.   Those agreements named Plaintiffs as employees in 2013 and 2016. Thus, as renumeration for their invaluable experience and extensive work in building MSI into a successful business, Riesen executed the Stock Option Agreements on behalf of MSI.

176.   Texas Labor Code Section 401.012(a) provides that an "employee means each person in the service of another under a contract of hire, whether express or implied, or oral or written."  Therefore, Plaintiffs' employment did not have to be memorialized in a written agreement to be recognized.

177.   Texas Labor Code Section 401.011(11) defines "compensation" as a "payment of a benefit."

178.   Riesen owed Plaintiffs compensation under the Stock Option Agreements for their work performed.

179.   Riesen failed to compensate Everington and Riesen under the Stock Option Agreements by preventing them from exercising their options under the

agreements during the merger of MSI.   Consequently, Riesen breached the employment agreements with Plaintiffs and in turn also breached the Stock Option Agreements by failing to pay Plaintiffs each 25% of the value derived from the sale.

180.   Riesen therefore breached: his oral agreement with Plaintiffs to develop MSI as partners and share in the company's sale profits, his employment agreements with Plaintiffs, and the Stock Option Agreements.

181.   Consequently, Plaintiffs are entitled either to specific performance of the contracts or to damages.

182.   Riesen should be ordered to perform and permit Plaintiffs to exercise their stock options or pay Plaintiffs an amount equal to the profits that Everington and White would have received (each 25% of the stock) if they were not prevented from exercising their stock options during the merger of MSI.  Alternatively, Riesen should be ordered to pay Plaintiffs money owed from the merger of MSI.

183.   By reason of the foregoing, as a direct and proximate cause of Defendant Riesen's breach, he is liable to Plaintiffs for compensatory damages in an amount in excess of $75,000.00, including but not limited to: a loss of business opportunity, loss of value in the partnership, lost profits, business disruption and any other relief this Court determines is just and equitable.

## COUNT III - FRAUDULENT MISREPRESENTATION

184.   Plaintiffs relied on the trust and confidence that had been built over the numerous years with Riesen on a personal and professional level in agreeing to work

with Riesen as partners to develop MSI from a start-up company into a valuable business that was to be sold for profit.

185.    Riesen manipulated this relationship with Plaintiffs to induce them to use their unique skill, work ethic and invaluable foreign contacts to agree to work as partners with him to develop MSI into a successful company for his own financial benefit and gain.

186.    Riesen used Plaintiffs' trust to his advantage in inducing them to rely upon his material misrepresentations throughout the years through various forms of communications that he would share in the profits of the sale of MSI once the company became lucrative to sell.

187.    Riesen knowingly or with reckless disregard for their truth made these material misrepresentations and never intended to fully share with Plaintiffs the profits from the sale of the company.

188.    Everington and White justifiably relied upon Riesen's material misrepresentations to their detriment by spending numerous years working countless hours to develop MSI into a lucrative business enterprise that went uncompensated. Plaintiffs also provided various training to MSI employees and gave business advice to Riesen on numerous occasions. Throughout the years, Everington and White continually promoted MSI in the marketplace for the company to attain additional beneficial contracts.

189.    Riesen's material misrepresentations caused financial detriment to Plaintiffs.  Upon reliance of Riesen's misrepresentations, Plaintiffs spent countless

uncompensated hours developing MSI into a viable company that would be sold for a profit with Riesen withholding their fair share from the sale of the company.

190. Riesen also knowingly or with reckless disregard for the truth made material misrepresentations to Plaintiffs that they would share in the profits of the company upon a change of control of the company by entering Stock Option Agreements with Everington and White on two occasions in 2013 and 2016, with the intent to deceive Plaintiffs and to never permit Plaintiffs to exercise their stock options or share in the actual profits of the sale of the company.

191. Everington and White justifiably relied upon Riesen's material misrepresentations by signing the Stock Option Agreements with the understanding that they would be able to exercise their stock options and share fifty percent of the company's profits upon a sale or merger. Consequently, Everington and White continued to spend countless hours developing the company.

192. Riesen betrayed Plaintiffs' trust and confidence by making false and material misrepresentations regarding the full and complete terms of the merger agreement knowing the statements were false or with reckless disregard for their truth.

193. Riesen's false and material misrepresentations were made with the intent to deceive Plaintiffs regarding the true value of the selling price of MSI and the rightful amount owed to them.

194. Riesen falsely represented the full and complete terms of the merger agreement in order to retain a greater portion of the profits from the merger including shares of stock in the acquiring company for himself.

195. Upon information and belief Riesen intentionally or with reckless disregard for the truth made false statements to Plaintiffs regarding the shares of stock he and others were to receive upon the merger of MSI with the acquiring company including the assigned value of the stock prior to and at the time of the merger.

196. Riesen knowingly or with reckless disregard for the truth made the material misrepresentation that he would pay Plaintiffs an additional $4 million (when it was feasible for him to do so) upon the signing of the Bonus Agreement. Riesen never intended to pay the additional money to Plaintiffs.

197. Riesen made false statements or with reckless disregard for their truth regarding the merger's terms with the intent to induce and in fact induced Everington into signing the Bonus Agreement on behalf of IAS.

198. Everington, feeling pressure to sign the Bonus Agreement containing a release, signed it in justifiable reliance on Riesen's false statements concerning the merger's terms which were material and intentionally misleading.

199. Everington signed the Bonus Agreement to his detriment based on Riesen's misrepresentations that the release was to cover Riesen in the event he was accused of trying to avoid taxes.

200. Everington signed the Bonus Agreement to his detriment also on the belief that Riesen was honoring his promise to pay Plaintiffs their fair share of the proceeds of the merger.

201. The release in the Bonus Agreement is voidable and unenforceable due to Riesen's fraud.

202. Plaintiffs continually and justifiably relied to their detriment upon Riesen's material representations by not receiving the full benefit of the bargain from the merger.

203. Plaintiffs justifiably relied on Riesen's false statements because they trusted him and suffered injury by not having knowledge of the complete terms of the merger.

204. Riesen continued to mispresent the material terms of the merger after Madison Springfield merged with the acquiring company.

205. Riesen made false representations regarding the merger's terms knowing these statements were false and misleading with the intent for Plaintiffs to rely on these falsities in accepting a lower amount than was owed to them.

206. Plaintiffs justifiably relied on Riesen's false statements by agreeing that Riesen owed them a lesser amount of $6 million from the merger.

207. Riesen continually made false representations or with reckless disregard for their truth that he would pay Plaintiffs an additional $4 million without ever intending to do so, and in fact never has paid Plaintiffs this remaining amount owed.

208. Riesen's continued misrepresentations of the full terms of the merger agreement were knowingly false, made with the intent of deceiving Plaintiffs, induced Plaintiffs to rely on Riesen's representations pertaining to the merger and Plaintiffs reasonably relied on those false statements to their detriment.

209. Riesen's material misrepresentations are evidenced by not being forthcoming regarding all potential sales for MSI and largely keeping Plaintiffs in the

35

dark about the specifics of potential sale opportunities. He continually refused to share with Plaintiffs pertinent documents pertaining to the merger of the company and hid the actual sale price of the company from Plaintiffs. Riesen continually made empty promises to Plaintiffs that he would show them the transaction documents.

210. Based on Riesen's fraudulent statements and actions, Plaintiffs seek a declaration that the release in the Bonus Agreement is not applicable to them.

211. Based on Riesen's fraudulent statements and actions, Plaintiffs also seek a declaration that the release in the Bonus Agreement is void and enforceable due to Riesen's fraudulent misrepresentations.

212. Based on Riesen's fraudulent statements and actions, Plaintiffs suffered actual damage including the loss of their rights to their rightful share of the proceeds from the merger of MSI.

213. Based on Riesen's fraudulent statements and actions, Plaintiffs are entitled to a disgorgement of any profits retained by Riesen from the merger.

214. Based on Riesen's fraudulent statements and actions, Plaintiffs are entitled to a full financial accounting of the proceeds of the merger.

215. Based on Riesen's fraudulent statements and actions, Plaintiffs are entitled to an imposition of a constructive trust in Riesen's profits from the merger.

216. By reason of the foregoing, Defendant Riesen is also liable to Plaintiffs for compensatory damages in an amount in excess of $75,000.00 as well as punitive damages for the fraud including any other relief this Court deems is just and equitable.

## COUNT IV - UNJUST ENRICHMENT

217. White and Everington provided substantial benefits to Riesen in their work, expertise and services provided over numerous years to help him build MSI from a start-up company into a successful profitable one.

218. Riesen at all times knew and appreciated the benefits White and Everington provided to him in that regard.

219. Riesen acknowledged these benefits on a number of occasions over the years.

220. As a direct result of the efforts of White and Everington, Riesen obtained a buyer for MSI resulting in Riesen's receipt of cash compensation as well as significant stock holdings in the acquiring company.

221. Everington and White were entitled to full disclosure of all material terms of the merger agreement.

222. Riesen at all material times intentionally concealed the merger's terms and actual proceeds of the merger from Plaintiffs when questioned about it.

223. Everington and White did not receive their rightful share of the proceeds resulting from the merger despite being entitled to receive the proceeds under their agreement with Riesen.

224. Riesen has been unjustly enriched by Plaintiffs' continual hard work, including uncompensated work, into making Madison Springfield into profitable company.

225.   Riesen has been unjustly enriched at Plaintiffs' expense, and it would be inequitable and unjust to permit Riesen to retain such benefits.

226.   Riesen has been unjustly enriched by obtaining and retaining the benefits of the merger that also rightfully belonged to Plaintiffs.

227.   Given the agreement reached by Riesen, White and Everington prior to the formation of MSI, it would be inequitable for Riesen to keep all of the value generated from the sale of MSI without paying White and Everington the value of their investment and services.

228.   Plaintiffs are entitled to a disgorgement of any profits retained by Riesen from the merger.

229.   Plaintiffs are entitled to a full financial accounting of the proceeds of the merger.

230.   Plaintiffs are entitled to an imposition of a constructive trust in Riesen's profits from the merger.

231.   By reason of the foregoing, Defendant Riesen is also liable to Plaintiffs for compensatory damages in an amount in excess of $75,000.00, and other relief as this Court deems just and proper.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that the Court:

a. Award Plaintiffs Specific Performance under the agreements and permit Plaintiffs to exercise their rights under the stock option agreements;

b. Award Plaintiffs actual and compensatory damages in an amount exceeding $75,000.00;

c. Award Plaintiffs punitive damages for Riesen's willful breach of his fiduciary duties and fraudulent inducement of Plaintiffs entering into agreements with him;

d. Impose a Constructive Trust in favor of Plaintiff Richard White over 25% of the value received by Timothy J. Riesen (or any trust or entity to whom he transferred an interest in MSI), directly or indirectly, from the sale of Madison Springfield Incorporated;

e. Impose a Constructive Trust in favor of Plaintiff Alexis Everington over 25% of the value received by Timothy J. Riesen (or any trust or entity to whom he transferred an interest in MSI), directly or indirectly, from the sale of Madison Springfield Incorporated;

f. Disgorgement of ill-gotten profits from Defendant Riesen;

g. An accounting of all merger-related proceeds;

h. Award any further relief that the Court deems just and equitable.

## DEMAND FOR JURY TRIAL

Plaintiffs hereby request trial by jury.


Dated:        August 26, 2025                    Respectfully submitted,

                                                        */s/ Dale R. Sisco*

Dale R. Sisco
dsisco@sisco-law.com
Florida Bar No. 559679
Peter A. Luccarelli
pluccarelli@sisco-law.com
Florida Bar No.: 1030952
Cynthia Sonnemann
Csonnemann@sisco-law.com
Florida Bar No.: 605581
777 S. Harbour Island Blvd.
Suite 320
Tampa, FL  33602
(813) 224-0555
(813) 221-9736 Facsimile
*Counsel for Plaintiffs*