# MADISON
# SPRINGFIELD
# INCORPORATED

**Alexis Everington**

Principal

Office:   +44 (0)

Mobile:  +44 (0)

**PP:08/24:000002**

Ό, τι είναι καλό
είναι δύσκολο να μάθουν

**PP:08/24/24:000003**

madisonspringfield.com

Exhibit "2"



# MADISON SPRINGFIELD INC.

## Incentive Stock Option Agreement

The Incentive Stock Option Agreement is executed on 12 November, 2013 by and between Madison Springfield, Inc. ("MSI"), a Texas corporation, and Alexis Everington, ("Employee") whose address is 85 Hicks House Frean Street, London, United Kingdom, SE16 4AS. Employee is a valued employee of MSI, and as an incentive for Employee to remain with MSI and to give increased effort during the term of employment, MSI grants Employee an option to acquire shares of the common stock of MSI subject to the following terms and conditions.

1. MSI grants Employee an option to purchase 10% of the outstanding and issued common stock, being 100 shares of the common stock of MSI, fully-paid and non-assessable at a price of $1.00 per share. This option is exercisable only as provided in this agreement and pursuant to the terms of the MSI Incentive Stock Option Plan.

2. Employee's option to purchase such shares may only be exercised:

   (a) upon a change of control of the Corporation, meaning (i) the sale or other transfer of the ownership of more than 50% of the outstanding shares of the Corporation's stock, (ii) a merger, reorganization or other consolidation of the Corporation into or with another entity that results in the Corporation's ownership (immediately before such merger or consolidation) owning less than a majority of the new entity (or, if the surviving entity is a wholly owned subsidiary, it parent immediately after such merger, reorganization consolidation), or (iii) the sale or liquidation of all or substantially all of the Corporation's assets; and

   (b) Employee is still employed by MSI at the time of such change of control.

3. MSI will give Employee notice of any such change of control or pending change of control, if Employee still holds an option to acquire MSI shares. Employee may exercise the option by giving MSI a cashier's check or other readily available funds for the purchase price of the stock being acquired (being $1.00 per share multiplied by the number of shares being acquired) and, if required, executing and delivering a form provided by MSI giving notice of the exercise of the option.

4. If the triggering event for the exercise of the option is a change of control in which all other shareholder of MSI are selling or otherwise transferring their shares of MSI stock, then Employee shall be required to sell any shares issued pursuant to this agreement on the same terms and conditions, and Employee agree to execute any documents necessary for such purpose. In such case, MSI may, at its discretion, convey the option shares directly to the purchaser and Employee

-1-    **Exhibit "3"**

shall be paid in cash or other consideration for the transfer of Employee's shares pursuant to this "drag-along" right. In addition, if all other shareholders of MSI are selling or transferring their shares as a part of the change of control event, then Employee shall have the right to sell any shares acquired under this option for the same terms and conditions.

5.      If not previously exercised, this option shall automatically terminate on the earlier to occur of ten years after the date of grant (being the date this agreement is executed) or the date Employee separates from service as an employee of MSI.

6.      In the event of any stock split, reverse stock split or other reconfiguration of stock issued by MSI, Employee's option shall be similarly reconfigured proportionately to the number of shares granted in this original option.

7.      This agreement, and the grant of the option to Employee, does not create any obligation on the part of MSI to retain Employee as an employee, nor any obligation on the part of Employee to remain as an employee of MSI.

8.      Unless MSI, at the time Employee exercises this option, has filed an effective registration statement with the Securities and Exchange Commission under the Securities Act of 1933, as amended (the "Act of 1933"), with respect to the sale of the shares of stock to be issued upon exercise of this option, Employee's right to exercise the option is subject to MSI's authority to require, as a condition of the delivery of any shares pursuant to the exercise of the option, the delivery to MSI of a letter satisfactory to MSI's counsel (a) representing that Employee intends to acquire the share of stock acquired upon exercise of the option for investment for Employee's own account and without a view to the resale or distribution of such shares, (b) agreeing that Employee will not sell or transfer those shares in the absence of an effective registration statement file with the Securities and Exchange Commission under the Act of 1933 with respect to such transfer; or an opinion of counsel satisfactory to MSI that such sale or transfer is not required to be registered under the Act of 1933 or any applicable state securities law or regulation.

9.      This agreement is made in, will performed in, and governed by the laws of the State of Texas.

10.      Employee acknowledges that he/she has had the opportunity and has been advised to consult with independent legal and tax counsel with respect to the consequences of this agreement and the option granted hereunder.

| | |
|---|---|
| MSI: | Madison Springfield Inc. |
| | By: ______________________ |
| | Timothy J. Riesen, President |
| Employee: | By: ______________________ |
| | Alexis Everington |

## MADISON SPRINGFIELD INC.

### Incentive Stock Option Agreement

The Incentive Stock Option Agreement is executed on 12 November, 2013 by and between Madison Springfield, Inc. ("MSI"), a Texas corporation, and Richard White, ("Employee") whose address is 7 Fernshaw Road, London, United Kingdom, SW10 0TB. Employee is a valued employee of MSI, and as an incentive for Employee to remain with MSI and to give increased effort during the term of employment, MSI grants Employee an option to acquire shares of the common stock of MSI subject to the following terms and conditions.

1.  MSI grants Employee an option to purchase 10% of the outstanding and issued common stock, being 100 shares of the common stock of MSI, fully-paid and non-assessable at a price of $1.00 per share. This option is exercisable only as provided in this agreement and pursuant to the terms of the MSI Incentive Stock Option Plan.

2.  Employee's option to purchase such shares may only be exercised:

    (a)   upon a change of control of the Corporation, meaning (i) the sale or other transfer of the ownership of more than 50% of the outstanding shares of the Corporation's stock, (ii) a merger, reorganization or other consolidation of the Corporation into or with another entity that results in the Corporation's ownership (immediately before such merger or consolidation) owning less than a majority of the new entity (or, if the surviving entity is a wholly owned subsidiary, it parent immediately after such merger, reorganization consolidation), or (iii) the sale or liquidation of all or substantially all of the Corporation's assets; and

    (b)   Employee is still employed by MSI at the time of such change of control.

3.  MSI will give Employee notice of any such change of control or pending change of control, if Employee still holds an option to acquire MSI shares. Employee may exercise the option by giving MSI a cashier's check or other readily available funds for the purchase price of the stock being acquired (being $1.00 per share multiplied by the number of shares being acquired) and, if required, executing and delivering a form provided by MSI giving notice of the exercise of the option.

4.  If the triggering event for the exercise of the option is a change of control in which all other shareholder of MSI are selling or otherwise transferring their shares of MSI stock, then Employee shall be required to sell any shares issued pursuant to this agreement on the same terms and conditions, and Employee agree to execute any documents necessary for such purpose. In such case, MSI may, at its discretion, convey the option shares directly to the purchaser and Employee

shall be paid in cash or other consideration for the transfer of Employee's shares pursuant to this "drag-along" right. In addition, if all other shareholders of MSI are selling or transferring their shares as a part of the change of control event, then Employee shall have the right to sell any shares acquired under this option for the same terms and conditions.

5.    If not previously exercised, this option shall automatically terminate on the earlier to occur of ten years after the date of grant (being the date this agreement is executed) or the date Employee separates from service as an employee of MSI.

6.    In the event of any stock split, reverse stock split or other reconfiguration of stock issued by MSI, Employee's option shall be similarly reconfigured proportionately to the number of shares granted in this original option.

7.    This agreement, and the grant of the option to Employee, does not create any obligation on the part of MSI to retain Employee as an employee, nor any obligation on the part of Employee to remain as an employee of MSI.

8.    Unless MSI, at the time Employee exercises this option, has filed an effective registration statement with the Securities and Exchange Commission under the Securities Act of 1933, as amended (the "Act of 1933"), with respect to the sale of the shares of stock to be issued upon exercise of this option, Employee's right to exercise the option is subject to MSI's authority to require, as a condition of the delivery of any shares pursuant to the exercise of the option, the delivery to MSI of a letter satisfactory to MSI's counsel (a) representing that Employee intends to acquire the share of stock acquired upon exercise of the option for investment for Employee's own account and without a view to the resale or distribution of such shares, (b) agreeing that Employee will not sell or transfer those shares in the absence of an effective registration statement file with the Securities and Exchange Commission under the Act of 1933 with respect to such transfer; or an opinion of counsel satisfactory to MSI that such sale or transfer is not required to be registered under the Act of 1933 or any applicable state securities law or regulation.

9.    This agreement is made in, will performed in, and governed by the laws of the State of Texas.

10.   Employee acknowledges that he/she has had the opportunity and has been advised to consult with independent legal and tax counsel with respect to the consequences of this agreement and the option granted hereunder.

-2-

-3-

MSI:     Madison Springfield Inc.

By: _____
Timothy J. Riesen, President

Employee:

By: _____
Richard White



**MADISON
SPRINGFIELD
INCORPORATED**

October 15, 2013

Dear Mr. Alexis Everington,

Madison Springfield, Inc. ("MSI" or the "Company") is pleased to extend to you an offer of employment with the Company as a Principal with an effective date on or about November 1st, 2013. Your primary place of employment will be London, United Kingdom. You will also be required, before your employment commences, to sign and comply with a confidentiality agreement obligating you not to use or disclose any confidential or proprietary, information you learn during the course of your employment with the company except in the proper performance of your duties.

Should you accept this offer, your compensation will include an hourly wage of $200.00 per hour for consulting and advisory services. You will also be eligible to participate in Company's stock option plan.

By signing this Offer Letter, you are representing to MSI that you are not a party to any agreement or other instrument (non-competition agreement, non-solicitation agreement, or similar document) that would prohibit or restrict your ability to be employed by MSI or to perform the duties consistent with the offered position. In addition, MSI expects that you will respect any proprietary information of any prior employers and that you will not use such information or documents in the performance of your duties for MSI.

This offer is valid until October 31, 2013, unless withdrawn before that time. Your signature below acknowledges your acceptance of this offer under the terms stated above. Please countersign this letter then fax (888) 222-3020 or email your signed copy back to MSI at tim.riesen@madisonspringfield.com.

We think you will find the work for MSI both satisfying and challenging. We are excited about having you join us, and look forward to working together.

Sincerely,

Tim Riesen
Managing Principal

I hereby acknowledge and agree to the terms stated in this letter:

_____          _____
(Your Signature)                          (Date)

Exhibit "5"

# MADISON SPRINGFIELD INCORPORATED

October 15, 2013

Dear Mr. Richard White,

Madison Springfield, Inc. ("MSI" or the "Company") is pleased to extend to you an offer of employment with the Company as a Principal with an effective date on or about November 1st, 2013. Your primary place of employment will be London, United Kingdom. You will also be required, before your employment commences, to sign and comply with a confidentiality agreement obligating you not to use or disclose any confidential or proprietary, information you learn during the course of your employment with the company except in the proper performance of your duties.

Should you accept this offer, your compensation will include an hourly wage of $200.00 per hour for consulting and advisory services. You will also be eligible to participate in Company's stock option plan.

By signing this Offer Letter, you are representing to MSI that you are not a party to any agreement or other instrument (non-competition agreement, non-solicitation agreement, or similar document) that would prohibit or restrict your ability to be employed by MSI or to perform the duties consistent with the offered position. In addition, MSI expects that you will respect any proprietary information of any prior employers and that you will not use such information or documents in the performance of your duties for MSI.

This offer is valid until October 31, 2013, unless withdrawn before that time. Your signature below acknowledges your acceptance of this offer under the terms stated above. Please countersign this letter then fax (888) 222-3020 or email your signed copy back to MSI at tim.riesen@madisonspringfield.com.

We think you will find the work for MSI both satisfying and challenging. We are excited about having you join us, and look forward to working together.

Sincerely,

Tim Riesen
Managing Principal

I hereby acknowledge and agree to the terms stated in this letter:

(Date)

1

Exhibit "6"

**SPECIAL MEETING BY UNANIMOUS CONSENT OF THE SOLE
SHAREHOLDER AND DIRECTOR OF MADISON SPRINGFIELD INC.
PURSUANT TO SECTION 6.201 OF THE TEXAS BUSINESS ORGANIZATIONS
CODE**

The undersigned, being the sole shareholder and director of Madison Springfield Incorporated (MSI) and being entitled to vote upon the resolutions hereinafter set forth, does hereby consent that the resolutions set forth below are deemed to be adopted to the same extent and to have the same force and effect as if adopted by unanimous consent in formal meetings of the shareholders and directors of the Corporation duly called and held for the purpose of acting upon a proposal to adopt such resolutions:

"RESOLVED, That the Incentive Stock Option Agreement executed on 12 November, 2013 shall be amended to grant Employee an option to purchase 25% of the outstanding and issued common stock, being 250 shares of the common stock of MSI, fully-paid and non-assessable at a price of $1.00 per share."

Dated    21 November, 2016.

_____
Timothy J. Riesen

**Exhibit "7"**

-1-

## MADISON SPRINGFIELD INC.

### Incentive Stock Option Agreement

The Incentive Stock Option Agreement is executed on 21 November, 2016 by and between Madison Springfield, Inc. ("MSI"), a Texas corporation, and Alexis Everington, ("Employee") whose address is 40 Chemin du Vinaigrier, Les Hauts De Villefranche, Villefranche-sur-Mer 06300, France. Employee is a valued employee of MSI, and as an incentive for Employee to remain with MSI and to give increased effort during the term of employment, MSI grants Employee an option to acquire shares of the common stock of MSI subject to the following terms and conditions.

1.      MSI grants Employee an option to purchase 25% of the outstanding and issued common stock, being 250 shares of the common stock of MSI, fully-paid and non-assessable at a price of $1.00 per share. This option is exercisable only as provided in this agreement and pursuant to the terms of the MSI Incentive Stock Option Plan.

2.      Employee's option to purchase such shares may only be exercised:

   (a)      upon a change of control of the Corporation, meaning (i) the sale or other transfer of the ownership of more than 50% of the outstanding shares of the Corporation's stock, (ii) a merger, reorganization or other consolidation of the Corporation into or with another entity that results in the Corporation's ownership (immediately before such merger or consolidation) owning less than a majority of the new entity (or, if the surviving entity is a wholly owned subsidiary, it parent immediately after such merger, reorganization consolidation), or (iii) the sale or liquidation of all or substantially all of the Corporation's assets; and

   (b)      Employee is still employed by MSI at the time of such change of control.

3.      MSI will give Employee notice of any such change of control or pending change of control, if Employee still holds an option to acquire MSI shares. Employee may exercise the option by giving MSI a cashier's check or other readily available funds for the purchase price of the stock being acquired (being $1.00 per share multiplied by the number of shares being acquired) and, if required, executing and delivering a form provided by MSI giving notice of the exercise of the option.

4.      If the triggering event for the exercise of the option is a change of control in which all other shareholder of MSI are selling or otherwise transferring their shares of MSI stock, then Employee shall be required to sell any shares issued pursuant to this agreement on the same terms and conditions, and Employee agree to execute any documents necessary for such purpose. In such case, MSI may, at its discretion, convey the option shares directly to the purchaser and Employee

shall be paid in cash or other consideration for the transfer of Employee's shares pursuant to this "drag-along" right. In addition, if all other shareholders of MSI are selling or transferring their shares as a part of the change of control event, then Employee shall have the right to sell any shares acquired under this option for the same terms and conditions.

5.      If not previously exercised, this option shall automatically terminate on the earlier to occur of ten years after the date of grant (being the date this agreement is executed) or the date Employee separates from service as an employee of MSI.

6.      In the event of any stock split, reverse stock split or other reconfiguration of stock issued by MSI, Employee's option shall be similarly reconfigured proportionately to the number of shares granted in this original option.

7.      This agreement, and the grant of the option to Employee, does not create any obligation on the part of MSI to retain Employee as an employee, nor any obligation on the part of Employee to remain as an employee of MSI.

8.      Unless MSI, at the time Employee exercises this option, has filed an effective registration statement with the Securities and Exchange Commission under the Securities Act of 1933, as amended (the "Act of 1933"), with respect to the sale of the shares of stock to be issued upon exercise of this option, Employee's right to exercise the option is subject to MSI's authority to require, as a condition of the delivery of any shares pursuant to the exercise of the option, the delivery to MSI of a letter satisfactory to MSI's counsel (a) representing that Employee intends to acquire the share of stock acquired upon exercise of the option for investment for Employee's own account and without a view to the resale or distribution of such shares, (b) agreeing that Employee will not sell or transfer those shares in the absence of an effective registration statement file with the Securities and Exchange Commission under the Act of 1933 with respect to such transfer; or an opinion of counsel satisfactory to MSI that such sale or transfer is not required to be registered under the Act of 1933 or any applicable state securities law or regulation.

9.      This agreement is made in, will performed in, and governed by the laws of the State of Texas.

10.     Employee acknowledges that he/she has had the opportunity and has been advised to consult with independent legal and tax counsel with respect to the consequences of this agreement and the option granted hereunder.

Madison Springfield Incorporated:

By
Timothy J. Riesen, Chief Executive Officer

Employee:                          By: _____
                                   Alexis Everington

-4-

**SPECIAL MEETING BY UNANIMOUS CONSENT OF THE SOLE
SHAREHOLDER AND DIRECTOR OF MADISON SPRINGFIELD INC.
PURSUANT TO SECTION 6.201 OF THE TEXAS BUSINESS ORGANIZATIONS
CODE**

The undersigned, being the sole shareholder and director of Madison Springfield Incorporated (MSI) and being entitled to vote upon the resolutions hereinafter set forth, does hereby consent that the resolutions set forth below are deemed to be adopted to the same extent and to have the same force and effect as if adopted by unanimous consent in formal meetings of the shareholders and directors of the Corporation duly called and held for the purpose of acting upon a proposal to adopt such resolutions:

"RESOLVED, That the Incentive Stock Option Agreement executed on 12 November, 2013 shall be amended to grant Employee an option to purchase 25% of the outstanding and issued common stock, being 250 shares of the common stock of MSI, fully-paid and non-assessable at a price of $1.00 per share."

Dated     21 November, 2016.

Timothy J. Riesen

**Exhibit "8"**

-1-

## MADISON SPRINGFIELD INC.

### Incentive Stock Option Agreement

The Incentive Stock Option Agreement is executed on 21 November, 2016 by and between Madison Springfield, Inc. ("MSI"), a Texas corporation, and Richard White, ("Employee") whose address is 7 Fernshaw Road, London, United Kingdom, SW10 0TB. Employee is a valued employee of MSI, and as an incentive for Employee to remain with MSI and to give increased effort during the term of employment, MSI grants Employee an option to acquire shares of the common stock of MSI subject to the following terms and conditions.

1.      MSI grants Employee an option to purchase 25% of the outstanding and issued common stock, being 250 shares of the common stock of MSI, fully-paid and non-assessable at a price of $1.00 per share. This option is exercisable only as provided in this agreement and pursuant to the terms of the MSI Incentive Stock Option Plan.

2.      Employee's option to purchase such shares may only be exercised:

(a)     upon a change of control of the Corporation, meaning (i) the sale or other transfer of the ownership of more than 50% of the outstanding shares of the Corporation's stock, (ii) a merger, reorganization or other consolidation of the Corporation into or with another entity that results in the Corporation's ownership (immediately before such merger or consolidation) owning less than a majority of the new entity (or, if the surviving entity is a wholly owned subsidiary, it parent immediately after such merger, reorganization consolidation), or (iii) the sale or liquidation of all or substantially all of the Corporation's assets; and

(b)     Employee is still employed by MSI at the time of such change of control.

3.      MSI will give Employee notice of any such change of control or pending change of control, if Employee still holds an option to acquire MSI shares. Employee may exercise the option by giving MSI a cashier's check or other readily available funds for the purchase price of the stock being acquired (being $1.00 per share multiplied by the number of shares being acquired) and, if required, executing and delivering a form provided by MSI giving notice of the exercise of the option.

4.      If the triggering event for the exercise of the option is a change of control in which all other shareholder of MSI are selling or otherwise transferring their shares of MSI stock, then Employee shall be required to sell any shares issued pursuant to this agreement on the same terms and conditions, and Employee agree to execute any documents necessary for such purpose. In such case, MSI may, at its discretion, convey the option shares directly to the purchaser and Employee

-2-

shall be paid in cash or other consideration for the transfer of Employee's shares pursuant to this "drag-along" right. In addition, if all other shareholders of MSI are selling or transferring their shares as a part of the change of control event, then Employee shall have the right to sell any shares acquired under this option for the same terms and conditions.

5.    If not previously exercised, this option shall automatically terminate on the earlier to occur of ten years after the date of grant (being the date this agreement is executed) or the date Employee separates from service as an employee of MSI.

6.    In the event of any stock split, reverse stock split or other reconfiguration of stock issued by MSI, Employee's option shall be similarly reconfigured proportionately to the number of shares granted in this original option.

7.    This agreement, and the grant of the option to Employee, does not create any obligation on the part of MSI to retain Employee as an employee, nor any obligation on the part of Employee to remain as an employee of MSI.

8.    Unless MSI, at the time Employee exercises this option, has filed an effective registration statement with the Securities and Exchange Commission under the Securities Act of 1933, as amended (the "Act of 1933"), with respect to the sale of the shares of stock to be issued upon exercise of this option, Employee's right to exercise the option is subject to MSI's authority to require, as a condition of the delivery of any shares pursuant to the exercise of the option, the delivery to MSI of a letter satisfactory to MSI's counsel (a) representing that Employee intends to acquire the share of stock acquired upon exercise of the option for investment for Employee's own account and without a view to the resale or distribution of such shares, (b) agreeing that Employee will not sell or transfer those shares in the absence of an effective registration statement file with the Securities and Exchange Commission under the Act of 1933 with respect to such transfer; or an opinion of counsel satisfactory to MSI that such sale or transfer is not required to be registered under the Act of 1933 or any applicable state securities law or regulation.

9.    This agreement is made in, will performed in, and governed by the laws of the State of Texas.

10.    Employee acknowledges that he/she has had the opportunity and has been advised to consult with independent legal and tax counsel with respect to the consequences of this agreement and the option granted hereunder.

-3-

Madison Springfield Incorporated:

By: _____
Timothy J. Riesen, Chief Executive Officer

Employee:

By: _____
Richard White

-4-



MADISON SPRINGFIELD INCORPORATED

Global Research Assessment Program
USSOCOM RFP: H92222-14-R-0022    Pg | 2

## Figure 1: Team MSI GRAP Organization Chart



*MSI's vast experience with supporting MISO projects in challenging environments establishes an efficient corporate structure that incorporates an innovative management approach with sufficient reach back.*

All team members actively involved in the task order work report to our GRAP PM. He will exercise continuous leadership, management, oversight and auditing of Task Order projects to ensure standardized subcontractor project management, schedule and quality, and funding limits.

Mr. Christian exclusively manages the GRAP program and is empowered with full authority to make decisions necessary to ensure successful delivery of the program objectives. The PM is supported by MSI's Research, Analysis, and SME Project Component Leads: Mr. Alexis Everington, Mr. Richard White and Ms. Laura Duboisse. All Project Component Leads report directly to the PM, who has reach back into all corporate resources and support functions. The PM reports to MSI's VP of Operations, John Legters, who oversees all of MSI's programs and provides strategic technical and corporate level support.

Ms. Terry Whited, MSI's Director of Contracts, and Ms. Kelly Huyghebaert, MSI's Business Operations Manager, support Mr. Christian on contract and business administration activities. Business administration and contract management functions report to Ingrid de la Fuente, VP of Business Development, who facilitates team member selection on the Task Order level in close collaboration with the PM, the Project Component Leads, MSI's VP of Operations and CEO.

### 1.1.2. STAFF EXPERIENCE AND RESPONSIBILITIES

Our program staff provides USSOCOM with the capabilities and level of experience necessary to respond rapidly and effectively to upcoming requirements. MSI has established a PMO in Tampa to respond rapidly to USSOCOM GRAP requirements, ensuring exceptional customer service and efficient program management. Our GRAP PM is supported in Tampa by our Director of Contracts. Table 2 shows our dedicated key personnel's experience and

Factor 1: Technical                                              Submitted: August 25, 2014

Source Selection Information • Madison Springfield Incorporated
Use or disclosure of data contained on this sheet is subject to the restriction on the title page of this proposal.
PP:08/24:002408

Exhibit "9"

MADISON
SPRINGFIELD
INCORPORATED

Global Research Assessment Program    Pg | 3
USSOCOM RFP: H92222-14-R-0022

responsibilities. All key personnel are current MSI employees or have signed Contingent Offer Letters and will be available to support GRAP Task Orders immediately upon contract award.

## Table 2: Key Personnel Experience at a Glance

### Steven Christian - Program Manager (PM) - Experience: 15+ years, MBA, PMP

Expert PM experienced in leading engagement, communications, studies & analysis projects. Five years of PM experience successfully leading USSOCOM programs. Proficient in program budgeting, ensuring the program meets objectives with supervisory oversight of, and responsibility for, cost, schedule, and technical performance. Expertise in managing numerous dedicated and shared resources and assets while strictly adhering to milestones, deadlines, budgets, resource allocations and deliverables while keeping a focus on customer satisfaction.

**Responsibilities: GRAP Program Management and Oversight**

- Customer interface
- TO team member selection
- Integration of team's capabilities
- Track key project milestones
- Weekly progress reports
- QA/QC

- Analyze work load requirements, develop schedules, assignments, coordinate timelines
- Management of employees, project leads, subcontractors
- Timely submission of all deliverables
- Risk Management
- Resolve issues

### Terry Whited - Director of Contracts - Experience: 23+ Years of DoD Contracting experience, MAM, DAWIA

Contracting expert with Contracting Certification (Level III) and DAWIA Program Management Level I certification. Exceptional knowledge of the FAR, DFAR, AFFAR and the supplements. Demonstrated experience in all facets of pre- and post award contract administration and contract negotiations. Extensive knowledge of complex contract types with a mixture of Contract Line Item Number (CLIN) types to include fixed price, incentives, and cost.

**Responsibilities: Contract Administration Subcontract Management**

- Contract Negotiations
- Contract Administration

- Subcontract Management
- CDRLS

- Budget and Invoicing (WAWF)

### Alexis Everington - Research Lead - Experience: 10+ years

Experience leading large scale, multi-national, survey data collection efforts in semi- and non-permissive research environments through indigenous research networks. Recent survey data collection efforts include Yemen, Libya, Syria (2014), Jordan (2013), Iran, Syria (2013) and Libya (2011). Arabic, Spanish & French language fluency.

**Responsibilities: All Quantitative and Qualitative Research Planning and Execution**

- Research planning/instrument development
- Management of indigenous research networks
- Management/training of in-country research teams

- Desktop research
- Literature reviews
- QA/QC (data/training)

### Richard White - Analysis Lead - Experience: 16+ years

Experience in large scale, multi-regional TAA, social and ethnographic intelligence, and MISO MOE analysis efforts in challenging environments. Expert in survey research & analysis techniques, instrument design, and quantitative/ qualitative analysis methods. Recent projects: Mexico, Ukraine, Somalia (2014), Jordan, Iran (2013), Nepal (2012). Fluent in French.

Responsibilities: Lead analysis/integration of qualitative and quantitative data and multiple feedback components

- Statistical Analysis (SPSS)
- Integrate Geospatial Data

- Integrate Intelligence Reporting
- MOE Indicator Framework

- Survey Analysis
- Trends Analysis

### Laura Duboisse - SME/Academia Engagement Lead - Experience: 7+ years

Experienced survey research expert leading engagement of subject matter experts on a range of issues including terrorism, insurgencies, radicalization, and transnational criminal organizations. 3+ years in-country research and data collection experience with indigenous research teams in challenging environments. Recent projects: Mexico, Yemen, Syria (2014), Iran (2013), Libya (2012). Fluent in French and Spanish.

Responsibilities: Manage extensive network of subject matter experts and academics

- Engage regional and thematic SMEs

- CONUS/OCONUS SME network Lead
- Deputy Research Lead

- Academia Outreach

### Tim Riesen, PhD - CEO/SME - Experience: 16+ years experience leading research & analysis projects (PhD, PMP)

Extensive survey research and communications campaign development experience in over 50 countries around the globe. Leading expert for prevailing terrorism, radicalization, and other security issues for USG clients: SOCOM, SOCCENT, SOCEUR, SOCPAC, SOJTF-A, AFRICOM, NORTHCOM, PACOM, CENTCOM, STRATCOM, JIEDDO, JISTF and numerous members of the US intelligence community. Recent projects: Afghanistan, Iraq, Ukraine, Mexico (2014), Yemen, Syria (2014), Somalia (2014), Jordan, Iran (2013), Venezuela (2013), Nepal, Libya, Pakistan, Uganda, Sudan. Fluent in Spanish/Portuguese.

Source Selection Information • Madison Springfield Incorporated
Use or disclosure of data contained on this sheet is subject to the restriction on the title page of this proposal.

PP:08/24:002409



**Alexis**

Yeah the number would have to be big right?



**Tim Riesen**

I still think $50m is realistic.

It makes for a good story that we bootstrapped this without external investment.



**Alexis**

I definitely agree – half of that is realisable profit straight off the bat

I am normally pessimistic about these sorts of things but I think the right fit could even be north of 50 in the case of a strategic buyer

i.e. someone who wants that market, the past performance, the access etc.



**Tim Riesen**

Exactly.

I am agree with you.

Anyone that only sees the value as a multiple of net profit or a NPV analysis is a fool. The value is the

PP:08/24:000974

Exhibit "10"

Nov 20 2020, 8:57 PM

Exhibit "11"



**Tim Riesen**



•••  8:5

♡

**Saturday, Nov 21 2020, 6:29 PM**



**Tim Riesen**

Hi – just a quick update as I have now spoken to three M&A firms.  All of the firms I have spoken to were referred by someone I trust (our accountants, our lawyer, our financial advisor).  The first one was less inclined to think we'd be able to sell majority control because the buyer will realize how essential we are to the operation and thus would only want to buy a minority stake to ensure we retain a vested interest in the success of the business.  They also didn't think $50m was realistic given the EBITDA multiples on

PP:08/24:000969

because the buyer will realize how essential we are to the operation and thus would only want to buy a minority stake to ensure we retain a vested interest in the success of the business.  They also didn't think $50m was realistic given the EBITDA multiples on firms of our size/type.  I don't place a lot of stock in their logic because they do not specialize in the national security community.  The second firm is a blue-blood M&A firm that think we are too small (they are one of Morgan Stanley's preferred M&A partners but they usually only work with firms with $100m or more in revenue).  The third firm falls under the Chertoff Group umbrella (Michael Chertoff was the former Secretary of Homeland Security under Bush) has an whose-who of retired national security people as their advisors and they specialize in security-related M&A.  Here is the marketing document they sent over.  I have calls with three more M&A firms over the next two weeks.  If the right buyer is found, the whole process could take less than a year.

 **Project BLACK - Discussion Materials_11.20.2020 final**
2.1 MB · pdf

*PP:08/24:000970*

MAY 2 2021, 2:00 PM

**Tim Riesen**



**Two Six Labs | Invent with Purpose**
twosixlabs.com/home

These guys seem to be serious buyers.

IST Research claimed to do the same thing we do but ⋯ 2:
with a mobile platform. They and Two Six were bought
by Carlyle at the same time:
https://www.carlyle.com//media-room/news-release-
archive/ist-research-and-two-six-labs-combine-form-
government-technology-platform

**IST Research and Two Six Labs
Combine to Form High-Growth...**
carlyle.com/media-room/news-release-archive/ist-res...

WEDNESDAY, MAY 5 2021, 1:50 AM

**Tim Riesen**

Other buyers that have come forward with strong
interest: https://www.orbisoperations.com and
https://www.prescient.com

Also https://theswiftgroup.com/about-us          ⋯ 1

**Mission Driven and Employee Focused**
theswiftgroup.com/about-us

Exhibit "12"

THURSDAY, MAY 6 2021, 5:04 PM

 **Tim Riesen**

Just had a great call with this guy.
https://www.prescient.com/about-us/who-we-are/jack-mckenna/

 **Jack McKenna | Prescient**

prescient.com/about-us/who-we-are/jack-mckenna

They have no USG business at present - all commercial.
They are financially backed by a family investment office
out of Chicago. They are interested in no only getting
into the USG space, but also selling their cyber
capabilities through our contracts, and using us to
support their commercial client work. They have 40
employees - I think all in NYC. They are in the closing
stages of a British firm that does work for the UK
government and commercial clients. They were
intrigued by our other offices in Frankfurt and Monaco
and the fact that those businesses are covered by our
MSI facility security clearance. Thus far, they are the
leader in my book. They tick every box (except
price...which we won't know for awhile). They have
expertise we don't, clients we don't, need us to get into
the USG space, have capabilities we can leverage, and
as they are privately held, have no obligation to a crazy
press release which would cause our non-USG signature
to take a hit.



**Tim Riesen**

There are likely two types of buyers that will want us. Strategic and Private Equity.



**Alexis**

My personal view is that selling a minority stake (first guys) would not be interesting. It would be a ball ache having someone looking over our shoulder all the time...and doubtlessly worried about their reputational risk given the type of thing we do



**Tim Riesen**

A Strategic buyer wants us because we have a capability that meshes well with their own or because we have work in sectors they do not but wish to have.



A PE buyer wants us just for the ability to run $250m    ⋯  6:43 PM worth of work at 10% profit through our contract.

Yeah, I am not interested in the minority sale...it doesn't fix anything and likely only makes things worse because we are now accountable to an investor.



**Alexis**

Yes I can see what you are saying: at one end

*PP:08/24:000972*

Exhibit "13"

someone does it as part of a strategy...at the other
end someone does it purely on numbers

 **Tim Riesen**

A technology company that does crowd sourcing –
like say a ▮▮▮▮▮▮ – would definitely be interested
because our ground capabilities would complement
their technology capabilities and we have contracts
they can only dream of.

 **Alexis**

Shame that USG doesnt have an opaque but well-
funded department that says "I will buy MSI so that
they we have sole access to their capability...sort of
like a semi-privatization of their intel-like
requirements."

 **Tim Riesen**

Oh, they do... ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

 **Alexis**

in any case, I think the next few weeks will be a good
time to look for a buyer...as we come out of COVID
people will want to splash the cash...

PP:08/24:000973

Interesting...

THURSDAY, APR 29 2021, 7:12 PM

**RW**



FRIDAY, APR 30 2021, 2:45 AM

 **Tim Riesen**

Hi. There is of course still a chance we won't sell now...or ⋯
soon....especially, if we cannot run up the score a bit
before offers start coming in.  If we do sell, we'll treat the
value transfer as a payment to IAS for services rendered
- same as any other payment.

Exhibit "14"

FRIDAY, MAY 28 2021, 12:01 AM

 **Tim Riesen**

Two meetings done. First meeting was a bust – lowest offer and they have no gov con experience. Second meeting was great – very strong alignment with our capabilities. Downside is they want to buy 100% and fold us under another company and they are the 3rd lowest offer. They may rethink their offer after today though.

Will sign and return document tonight. Will be electronic ⋯ 12:02 A
sig though – I have no access to printer while traveling.

MAY 28 2021, 9:35 AM

JUN 3 2021, 7:00 PM

 **Tim Riesen**

Formal management meetings are complete. Now, they get access to our 2021 financials and related materials and decide if they want to make a formal offer. In my mind, the best deal is with Blue Delta Capital. They want us as a stand-alone investment (not absorbing us into some other company). Then, tied for 2nd are three different companies: Orbis (backed by McNally), Swift Group (backed by DC Capital), and ECS (wholly owned subsidiary of publicly-traded ASGN). In 3rd place is a completely dysfunctional recent merger of Six Two Lab and IST Research (backed by Carlyle). They have until June 28th to submit a formal offer. If all goes according to plan, we should close in August.

Exhibit "15"

**FRIDAY, JUL 2 2021, 10:50 AM**

 **Tim Riesen** ✎

Good morning. I have now spoken to both the bankers and our lawyer. The consensus is that the DC Capital offer is garbage. Valuation is way too low and the terms are way too onerous. They also agree that the blue Delta offer is low but bad it checks many of our other boxes. Namely, that we remain in control. They suggest that we wait until the financials improve and revisit the conversation with Blue Delta. There is a slight possibility that Blue Delta will raise their offer when we don't accept their original offer but it won't likely be high enough.

 **Alexis**

♡ Nice. Sounds like a plan.                                    ...

**TUESDAY, JUL 6 2021, 5:21 PM**

 **Tim Riesen**

Had a call with bankers and lawyer about the Blue Delta   ... 5:21 PM
Capital offer. The deal checks a few of the boxes - we remain in control, no one tinkers with our business, they've had success with similar companies (METIS, IST Research) in growing their business for a future, larger acquisition, they'll put money on the balance sheet to fund operations and hire more sales people, and they have a good rolodex across the community to assist with BD. The main downside is the amount they are willing to invest. As it stands now, they are willing to put $5m on the balance sheet and pay $6.5m in proceeds. After taxes, banker commission, and legal/accounting fees, that would generate net proceeds of roughly $5m. Those proceeds would yield a payment to IAS in the amount of $2.5m upon closing. Of course I have not accepted the deal as it is written and am pushing for them to increase the valuation on the basis of the work we have in the pipeline. The recent mad dash on ▓▓▓▓ will make our June financials look better that they were looking and we have a number of other opportunities in the pipeline. Anyway, that is the latest update. We're sending our proposed changes to the T&Cs by
♡ Thursday.



**Tim Riesen** ✎

We did discuss it last night. We were waiting for our 2021
financials to be complete before ▮▮▮▮▮ would assign a
value and send a term sheet. The financials were
finished late Friday. We lost about $700k on $11.5m in
revenue. I expect their final term sheet will show that
they value us at $11.5m - maybe $12m. The most they
would give us in cash is $4.5m and maybe assume
$500k in debt, with the rest in stock. The $7-8m in MSI
shares will be worth about 1% of the ▮▮▮▮▮ shares
(their investors value them at $850m). If we agree to do
the deal, I would pay you guys at least $2m now ($1m
each) and then the rest as soon as I was able to liquidate
my shares (and document that by agreement).
Assuming they don't lose any value, I would expect you
to each get your $2.5-3m in 18-24 months.

25% of the shares would vest immediately. Then 25%      ⋯
each year for three years. I am locked in for 18 months -
meaning I could not leave for 18 months but the shares
would keep vesting. If it doesn't work being owned by
them, then IAS just stops supporting them. I'd bail at 18
♡  months and we could start a new company.



**Alexis**

Heya - thanks these details are very useful in painting a
picture of where we are at.

Whatever money comes out now...we could just lock it
into an interesting earning account for the three of us?

**Exhibit "16"**

 **Tim Riesen**

You're each due at least $3m at that valuation. While I am greatful for the gesture, please accept what is yours. I'm going to lose 50% of everything I have so better for there not to be any links from me to your assets.

 **Alexis**
Let's talk in person

 **Tim Riesen**
 Sounds good                                    ...



MAY 10, 10:04 PM

**Tim Riesen**

I think ██████ is going to pull the plug on the deal. The financials have shown them that things have not changed materially for the better and ██████ esignation gives them an immediate out as it is a condition of closing (that no key employees have left the company).

**Tim Riesen**

███████████████could not have timed it any worse.

**WEDNESDAY, MAY 11, 12:09 AM**

**Alexis**

Ultimately I can't believe they would judge a company on the departure of one person? Unless it was the founder and owner?

Breathe in. ████████████████████

Hopefully they come to their senses

**Tim Riesen**

████s flying to Colombia. I will speak to him when he lands at 1030pm.

**Alexis**

Good luck. Whatever you need from this end....          ⋯  1:

**Tim Riesen**

Thanks.

Exhibit "17"



THURSDAY, APR 21, 7:10 AM

**Tim Riesen**

**New Messages**

Need to chat with you tomorrow early. There's been some developments with Polymath on the negative side and we need advice on how to proceed. Feel like it could impact our deal and we need to get clarity sooner rather than later.                           22:39

Crashed early last night with jetlag. Had this messsge   ⋯ 7:11 AM
from ▓▓▓▓▓ CEO) waiting for me. POLYMATH is
what they call our big contract.

No idea what it means. Interestingly, we finally heard
back on the CI issue and that meeting is set for Monday.

**Tim Riesen**

If they are so radioactive, might not be a good idea to
sell to them.

**Alexis**

Yeah I defo think it strengthens the MSI hand

If nothing else it gives you a very good reason to say that
you want to think about what this means for a sale...so
that we can't get more time to resolve our own CI issue!!

**Tim Riesen**

Actually, ▓▓▓▓ seems to be considering canceling the
merger.

**Alexis**

Hmmm doesn't that seem odd?                           ⋯ 1:

I would have thought it would make him more desperate
to get MSI so there was a legitimate way to pass off the
work

**Tim Riesen** ✎

He thinks our contract could be canceled if they own us.
Thus, there is no incentive to buy us.

**Alexis**

Would you have to declare it ?

Guessing so

Exhibit "18"



**Tim Riesen**

Latest on merger: 1) State of Texas approval has
occurred. 2) Final merger paperwork will be signed by
me and ▮▮▮ on Tuesday. 3) Merger partner no longer
requires the W8 from you guys. 4) Funds should be
wired to you on Tuesday.



**RW**

Wow sounds promising... my only worry is for tax
purposes etc i would need paperwork can you provide
some ?



**Tim Riesen**

What kind do you want?

Since it was being wired to IAS, I didn't think taxes were
a concern.



**Alexis**

Personally I don't need it for tax reasons but it would be
nice to see the official ▮▮▮▮/MSI agreement...being a
part owner and all...



**Tim Riesen**

Yup. That's easy.

Can you please confirm the wire instructions I sent?

**Exhibit "19"**



**Alexis**

No, I am not disappointed at all! I just don't count
anything until it is in and this ▮▮▮▮▮ journey has been a
rollercoaster. That is all.

But the bigger thing for me is just a shared
understanding and I dont have that. As one of the three
guys...I think that is a reasonable request...it seems you
dont want to share that?

These things escalate and I dont want to go down that
road. We can talk about it if you like. I am just asking, in
my capacity as an owner and sufferer of this crazy ride,
to have equal visibility of this deal



**Tim Riesen**

I will share what I am allowed to share. Can we please        ⋯ 4:2
wait for an opinion from the lawyers when they get in the
office? You guys get half of $12m - all in cash. I get to
hope the stock will be worth the rest, and then I split it
♡   with my soon-to-be ex.



**Alexis**

Yes definitely, for gods sake I don't want us to have an
argument about a win!

thanks Tim

## BONUS AGREEMENT

This Bonus Agreement (this "Agreement") is made as of [May 10th], 2022, between Madison Springfield Inc., a Texas corporation (the "Company"), and International Advisory Services, an United Arab Emirates entity ("Recipient").

1.    Bonus Payment Amount.  In consideration of Recipient's service to the Company, the Company would like to offer to Recipient a one-time cash bonus of USD $2,000,000, subject to withholding pursuant to U.S. federal, state and local applicable laws or regulation and non-U.S. Taxes as may be required to be withheld pursuant to any applicable law or regulation (the foregoing, the "Bonus Payment Amount").

2.    Conditions to Bonus Payment.  Payment to Recipient of the Bonus Payment Amount is contingent upon (a) the acquisition of the Company (the "Transaction") by Ikaika, Inc. ("Buyer") under the Agreement and Plan of Merger dated on or around the date hereof, by and among the Company, Buyer, Buyer's parent ("Ultimate Parent") and other parties thereto, and (b) Recipient's execution and delivery of this Agreement to the Company no later than the date of closing of such acquisition (the "Closing").

3.    Recipient Acknowledgement.  Recipient acknowledges and agrees that (i) Recipient is not entitled to any other bonus or other similar payment in connection with the Transaction, (ii) the Company will not owe Recipient any fees, costs or expenses in connection with the payment of the Bonus Payment Amount, and (iii) Recipient understands that it (and not any Releasee as defined below) shall be solely responsible for its own tax liability that may arise in connection with the Bonus Payment Amount, and has not relied on any statements or representations of any Releasee for any legal and tax advice. Recipient represents and warrants that this Agreement has been duly executed and delivered by Recipient, constitutes a valid and binding obligation of Recipient, and assuming due authorization, execution and delivery by the other parties hereto, is enforceable against Recipient in accordance with its terms.

4.    Public Disclosure. Except as otherwise required by law, no disclosure (whether or not in response to an inquiry) of the existence or the subject matter of this Agreement or the Transaction shall be made, whether prior to or after the Closing, by Recipient or on Recipient's behalf unless approved by Buyer in writing prior to such disclosure. Notwithstanding the preceding sentence, in the event that Recipient is required by law to make any such disclosure, Recipient may make such disclosure; provided that Recipient shall notify Buyer in writing prior to making such disclosure, shall use Recipient's commercially reasonable efforts to give Buyer an opportunity (as is reasonable under the circumstances) to comment on such disclosure, and shall make only such disclosure as Recipient is legally obligated to disclose.

5.    Release. Conditioned upon, and effective as of, Recipient's receipt of the Bonus Payment Amount, Recipient, for and on behalf of itself and its predecessors, successors, affiliates, and assigns (collectively, the "Releasors") hereby knowingly, fully, unconditionally, completely and irrevocably forever releases and discharges Ultimate Parent, Buyer, the Company, and each of their respective current and former affiliates (together, the "Released Companies"), and each of the Released Companies' respective past or present officers, directors, stockholders, partners, members, subsidiaries, affiliates, agents, advisors, representatives and employees, and each of their respective predecessors, successors, heirs, executors, administrators, beneficiaries, legatees and assigns (collectively, the "Releasees"), from, and agrees not to sue any of the Releasees with respect to, any and all claims, actions, causes of action, suits, debts, dues, sums of money, accounts, reckonings, covenants, contracts, controversies, agreements, promises, variances, trespasses, damages, judgments, expenses, executions, affirmative defenses, demands and other obligations or liabilities whatsoever, in law or equity, whether known or unknown, past or present, asserted or unasserted, suspected or unsuspected, fixed or contingent, which Recipient or any of the Releasors ever had, now have or may ever have against any of the Releasees, in each case to the extent based on, arising out of, or resulting from or relating, directly or indirectly, to the negotiation, execution and delivery of this Agreement or any amounts payable by the Company or its affiliates.

**Exhibit "20"**

6. <u>Entire Agreement</u>. This Agreement sets forth the entire agreement and understanding between the parties relating to the matter comprising the subject of this Agreement and supersedes any and all prior agreements, arrangements and understandings, written or oral, between Recipient and the Company with respect to the subject matter hereof.

7. <u>Governing Law</u>. This Agreement shall be governed by and construed in accordance with the laws of the State of Delaware, regardless of the laws that might otherwise govern under applicable principles of conflicts of laws thereof.

*(Signature Page Follows)*

IN WITNESS WHEREOF, the undersigned has executed and delivered this Bonus Agreement as of the date first set forth above.

**COMPANY**

**Madison Springfield Inc.**

By: _____
Name:  Timothy Riesen
Title:    Chief Executive Officer

**RECIPIENT**

**International Advisory Services**

By: _____
Name:  Alexis Everington
Title:   Director of Operations

 **Tim Riesen**

s asking for a release for the $2m payment coming to you – just to be covered in the event I am ever accused of trying to avoid taxes on the $2m by sending it to you.  I should have that release today.

Think it only requires Alexis' signature as you will be signing for IAS.

♡  Here is the agreement.                                    ⋯  10:53 PN

  **30A9C7B4-E245-4636-8E81-46A60F8EEA66**
44.51 KB · DOCX

 **Alexis**

If the merger partner knows about us and knows we have those stock options then they shouldn't be too bothered?

 **Tim Riesen**

They wrote the release you signed. They of course know about you.  They did all kinds of due diligence on IAS as part of their KYC process before they would approve the payment. They haven't even told the Board of Directors about the deal. They are keeping it that close hold.

Can we do a phone call in 10 minutes?

I'm in the car headed to the airport

Exhibit "21"

 **Tim Riesen**

Hi - I am working on that with their lawyer. Please
understand, you received more than 90% of the cash.
All of my potential upside is tied up in the stock. I would
really not want to jeopardize that or my employment by
disclosing confidential information.

 **Alexis**

I understand. My thinking is that I nearly threw in the
towel after the misunderstanding involving the money
that we had set aside for Mare Nova. I really REALLY
want to avoid a situation like that from ever happening
again. The best way is for us all to share the documents
so that we are on the same page.

I am just guessing but probably you would feel the same
way if it was the other way around and you were a 25%
owner of the company...you would want to see it all
right? I would definitely send it all to you guys out of fear
that something might be misunderstood.

 **Tim Riesen**

Well, I am certainly glad you did not throw in the towel      ...
and I hope you are as well. You guys seem disappointed
in getting $2m plus another $4m down the road. I have
not read anything positive from either of you about this
outcome. I guess maybe you cannot appreciate how big
a stress reliever this is for me. That a deal happened at

♡  all with our financials is a miracle.

**Exhibit "22"**

CONFIDENTIAL

**DUNLAP
BENNETT&
LUDWIG**

**8300 Boone Blvd., Suite 250
Vienna, Virginia 22182
Phone: (703) 777-7319
Fax: (703) 777-3656
www.dbllawyers.com**

**Roy R. Morris
rmorris@dbllawyers.com**

August 3, 2022
Supplemented September 13, 2022

**VIA ELECTRONIC MAIL**

Alexis Everington (alexis@internationaladvisoryservices.com)
Richard White (richard@internationaladvisoryservices.com)
International Advisory Services

Re:    CONFIDENTIAL: Summary of Transaction Terms

Messrs. Everington and White:

Pursuant to a Bonus Agreement dated as of May 10, 2022 between Madison Springfield Inc.
(MSI) and International Advisory Services (IAS), IAS was paid $2 million upon on the
acquisition of MSI by a company we will call Ultimate Parent on or about June 7, 2022 (the
Transaction). The payment was made by Cortland Capital Markets Services on behalf of MSI. I
understand that Tim Riesen is committed to paying IAS another $4 million if and when he is able
to liquidate shares he acquired in the Transaction, as detailed below.

Under Section 11.3 of the acquisition agreement, the Stockholder Representative (Tim Riesen) is
permitted to disclose information relating to the Transaction to "employees, advisors, agents or
consultants of the Stockholder Representative and to the Indemnifying Parties, in each case to
only those parties who have a need to know such information, *provided* that such persons are
subject to confidentiality obligations with respect thereto which contain confidentiality
restrictions consistent with the Confidential Disclosure Agreement."

You have executed the previously provided Confidential Disclosure Agreement and you have
represented to the Stockholder Representative that you have a need to know the transaction
terms. Accordingly, at the request of the Stockholder Representative, I am providing the below
summary of the material transaction terms.

**Exhibit "23"**